## WALKER *v.* D'ALESANDRO

[No. 44, October Term, 1956.]

*Decided February 1, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Fred E. Weisgal* and *Robert C. Prem,* with whom were *H. Warren Buckler, Jr.,* and *Stanley Sollins* on the brief, for appellant.

*Edwin Harlan, Deputy City Solicitor of Baltimore,* and *Shirley B. Jones, Assistant City Solicitor,* with whom was *Thomas N. Biddison, City Solicitor,* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

Glenn F. Walker, stated in the declaration to be "a painter and producer of fine works of art", brought this action in tort against Thomas D'Alesandro, Jr., individually. The declaration contained four counts charging, respectively, (1) the wrongful removal of a picture belonging to the plaintiff from its assigned place in an art exhibit at the Peale Museum (sometimes known as the Municipal Museum) in the City of Baltimore, (2) interference with contractual relations between the

plaintiff and the Trustees of the Museum pursuant to which the picture, painted by the plaintiff, was to have been shown as a part of the art exhibit for a period of three weeks, (3) slander and (4) libel. A claim for an injunction under Code (1951), Article 75, Section 136, was included in the declaration. The defendant demurred to each count of the declaration and in response to an order to show cause why the claim for an injunction should not be granted, filed an answer setting up defenses to that claim raising questions of law and of fact. After a hearing the trial court sustained the demurrer without leave to amend and dismissed the claim for an injunction. Judgment for the defendant for costs was entered, and the plaintiff appeals from that judgment. In this Court he challenges the sustaining of the defendant's demurrer, but not the dismissal of the claim for injunctive relief.

As above indicated, the case was and is submitted on the defendant's demurrer to the plaintiff's declaration. It is old and familiar law that the office of such a demurrer is to test the legal sufficiency of the facts alleged in the declaration to state a cause of action. A demurrer admits, for the purpose of determining that question, the truth of all well pleaded allegations of fact contained in the declaration, and it cannot either contradict facts so alleged or add others. *Poe on Pleading* (*Tiffany's Ed.*), Sec. 705; *Willoughby v. Trevisonno,* 202 Md. 442, 97 A. 2d 307; *Adams v. Baltimore Transit Co.,* 203 Md. 295, 100 A. 2d 781; *De Boy v. Harris,* 207 Md. 212, 113 A. 2d 903; *Martin G. Imbach, Inc. v. Deegan,* 208 Md. 115, 117 A. 2d 864. If there are facts as to which there is no genuine dispute which the defendant thinks entitle him to judgment as a matter of law, he may, under our modern practice, submit them by a motion for summary judgment supported by one or more affidavits; and if (after an answer or hearing, or both, or an opportunity therefor) the court is satisfied that there are facts as to which there is no genuine dispute, which show a good defense, a summary judgment may be entered for the defendant. (See Rule 610 of the Maryland Rules, effective January 1, 1957, and the General Rules of Practice and Procedure in force prior thereto and at the time of institution of this suit, Part Two, IV, Rules 1-4.) Disputed or controversial

allegations of fact and denials of facts alleged by the plaintiff are, of course, properly raised by pleas for determination by trial on the merits.

In the instant case the defendant's demurrer sets forth, with regard to each of the four counts of the declaration, allegations of additional facts which are not to be found in the declaration and which undertake to set up affirmative defenses. To such extent as these asserted additional facts constitute matters of which the court may take judicial notice, such allegations are not open to more than technical objection, since the court may properly take such facts into consideration, regardless of what is said in the demurrer.[1]

One paragraph containing allegations of facts additional to those shown by the declaration is to be found among the grounds urged in support of the demurrer as to each of the four counts. (There are further additional, factual allegations in support of the demurrer to the defamation counts which will be mentioned later.) The paragraph common to the demurrer as to all four counts reads as follows: "That the alleged acts of the defendant were performed by him as Mayor of the City of Baltimore, and not as an individual, in which capacity he was being sued."

The declaration is silent with regard to the fact that the defendant is, and at the time of the alleged wrongs was, the Mayor of the City of Baltimore. The trial court took judicial notice of that fact, and in this we think there was no error. *Lucas v. Boyd* (Ala.), 47 So. 209; *Cooper v. O'Connor* (U. S. C. A., D. C.), 99 F. 2d 135 (cert. den. 305 U. S. 643); *Wigmore, Evidence,* 3rd Ed., Vol. 9, Secs. 2576, 2583; *McCormick, Evidence,* Sec. 328, pp. 703-704. We find no conflict with this view in *Hopkins v. North,* 151 Md. 553, 557, 135 A. 367, 368. We think it is supported by the statement made in *State v. Price,* 12 Gill & J. 260, that "We know of no recognized presumption either of law or fact, that imputes to the Court an ignorance of a matter, like the present, of such notoriety as to be within the knowledge of the community at

---

1. Cf. Code (1951), Art. 75, § 2, now Rule 301 b, Maryland Rules.

large." See also *Dean v. State,* 205 Md. 274, 280-282, 107 A. 2d 88, 90, where we held that a judge in Baltimore City might take judicial notice of the fact that there were streets in that City bearing the names stated in an application for a search warrant.

Although we agree that the trial court properly took judicial notice of the fact that Mr. D'Alesandro was the Mayor, we think that whether or not the court could take judicial notice that his actions alleged in the declaration were taken in his official capacity presents two quite different questions. One pertains to taking judicial notice of certain provisions of the Charter and Code of Baltimore City, the other to their sufficiency (if properly before the court) to show that the actions and words complained of were taken or uttered in the discharge of the defendant's duties as Mayor or in matters so closely related to his official duties as to bring him within the protection of the absolute privilege which he claims and to which the trial court held him to be entitled. Underlying the latter of these questions is the question as to whether or not, as the trial court held, the office of Mayor of Baltimore City is an office to which an absolute privilege is extended.

The defendant claims, and the trial court held, that he was entitled to an absolute privilege with regard to actions or words involved in each of the four counts of the declaration. Privilege is not confined in the law of torts to matters of defamation (See *Restatement, Torts,* Vol. I, § 10; *Prosser, Torts* (2nd Ed.), § 16), though it has many applications in that particular field; and it may be either absolute or qualified. In this case the defendant has elected to demur to the declaration, and a defense based upon a qualified privilege is not available on demurrer. *Powell v. American Towing & Lighterage Co.,* 131 Md. 539, 102 A. 747; *Cobourn v. Moore,* 158 Md. 358, at 367, 148 A. 546, at 549.

The basis for immunity from liability by reason of privilege is that a public or social interest is to be served by according the privilege; and as Professor Prosser observes (op. cit. § 16), "The sliding scale by which the law balances the interests of the parties to accomplish a social purpose is nowhere better illustrated than in the field of privilege." An absolute

privilege is accorded to judicial proceedings and to legislative proceedings and to the activities of high executive officers. (As regards legislative matters, it is usually established under a constitutional provision.) As to executive officers, see *Spalding v. Vilas,* 161 U. S. 483 (U. S. Postmaster General) and *Matson v. Margiotti,* 371 Pa. 188, 88 A. 2d 892 (State Attorney General). See also an elaborate Note on *Defamation* in 69 *Harv. L. Rev.,* beginning at page 875, dealing with absolute privilege and the basis therefor at pages 917-924 and with qualified privilege at pages 924-931, and the *Restatement, Torts,* Vol. III, § 591.

Much of the argument in this Court was devoted to the question of whether or not the Mayor of the City of Baltimore occupies such an office as is within the absolute privilege. We may assume, without deciding, that the privilege does apply, but that assumption does not dispose of the case. The question still remains whether or not the words or actions complained of were said or taken in the discharge of the officer's duty or in some matter closely connected therewith. In *Spalding v. Vilas, supra,* at 161 U. S. 498, the Supreme Court said: "As in the case of a judicial officer, we recognize a distinction between action taken by the head of a Department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision." A like rule is recognized in *Matson v. Margiotti, supra,* a 3-2 decision, in which a vigorous dissenting opinion written by Justice Jones and concurred in by Justice Chidsey was based upon the view that the Attorney General was acting outside the scope of his authority and hence was entitled to only a conditional privilege. See the comment on this case in the note in 69 *Harv. L. Rev.* above cited, at page 919.

In reaching the conclusion that the defendant was entitled to an absolute privilege in respect of the acts and statements complained of, the trial court took judicial notice of certain provisions of the Charter of Baltimore City and of an ordinance of the Mayor and City Council of Baltimore. The Code provides for the methods of proof of such an ordinance, not that the court shall take judicial notice thereof; and the general

rule is that courts do not take judicial notice of such ordinances. Code (1951), Article 35, Section 75; *Central Savings Bank v. Baltimore,* 71 Md. 515, 18 A. 809, 20 A. 283; *Givner v. Cohen,* 208 Md. 23, 116 A. 2d 357, and cases therein cited. The rule is not inflexible, as the *Givner Case* and *Shanfelter v. Baltimore,* 80 Md. 483, 31 A. 439, and *McNally v. Moser,* 210 Md. 127, 122 A. 2d 555, show, where the ordinances have been considered below; and we shall comment upon the ordinance actually cited in the opinion of the trial court for much the same reasons that ordinances not duly proven were considered in those cases.

To sustain the applicability of the absolute privilege the defendant relies, as did the trial court, upon the grant of police power to the City under Section 6 (24) of the Charter, the powers conferred upon the Mayor by Section 10 of the Charter and the terms of the lease of the Peale (or Municipal) Museum embodied in and ratified by Ordinance 1273 of 1930-31 now codified as Article 2, Section 2 of the Baltimore City Code. We shall examine these briefly.

All powers granted under Section 6 of the City Charter are granted subject to the provisions of the Constitution and Public General Laws of Maryland. *Heubeck v. City of Baltimore,* 205 Md. 203, 107 A. 2d 99. Furthermore, those powers are granted to the municipal body corporate, the Mayor and City Council of Baltimore, not to any single officer thereof; and there is no claim or showing that any ordinance has been passed authorizing or purporting to authorize the Mayor to take the action complained of.

Under Section 10 of the Charter two provisions are cited in support of the Mayor's asserted power to act. One is that he "shall have all the power of a conservator of the peace"; the other is that he "shall have general supervision over all municipal officers and agencies." We do not think that the powers of a conservator of the peace extend to the censorship of works of art or alleged works of art. In this State, various officers, including justices of the peace and judges, are among those invested with the powers of conservators of the peace. So far as we are informed, none of them have ever been thought to possess powers of censorship. Censorship is, indeed, pro-

vided for by statute in the case of motion pictures (Code (1951), as amended, Article 66A), but by a board especially created for that purpose. We must again bear in mind that the statements attributed to the defendant as to the obscene and morally objectionable character of the plaintiff's picture are alleged in the declaration to be false and malicious and that the defendant's demurrer (for present purposes) admits the truth of these allegations of falsity and malice.

When we turn to the supervisory power of the Mayor over all municipal officers and agencies, there is nothing to show even that the Peale Museum is a municipal agency. Indeed, the lease relied on by the defendant and embodied in Article 2, Section 2 of the City Code, seems to suggest the contrary. It provided (originally at least) for the election of the Mayor and two other City officials to the Museum Board of Trustees.

Finally, the lease itself shows that the City is the landlord owning the Museum building, that it is to have access to the building "for general visitation and supervision" and "for the purpose of the performance of the duties devolved upon it by the Laws of the State of Maryland, or Ordinances of the City of Baltimore." It provides that "the police powers and supervision of * * * [the City] shall extend in, through and about said building."

No State law or City ordinance authorizing the exercise of powers of censorship by the Mayor and the removal of pictures which he may deem objectionable has been cited to us. On the facts as presently admitted by the demurrer, an unobjectionable picture has been removed. That would obviously be beyond the duties of the Mayor; and even if the picture were objectionable, we do not regard the censorship by the Mayor of pictures publicly exhibited in a City-owned building and the removal of such as he may deem objectionable, or his making adverse public comments thereon, as being either within the scope of his duties as Mayor or so closely related thereto as to be entitled to an absolute privilege by reason of his important public office. This Court long ago expressed opposition to the extension of the doctrine of absolute privilege (*Maurice v. Worden,* 54 Md. 233) to persons occupying offices not previously recognized as falling within the protection of absolute privilege.

Though we are not deciding in this case whether or not the doctrine of absolute privilege should be extended to such an office as that of Mayor of a great city, we think that the same reasoning which underlies the reluctance to extend the offices to which the privilege applies, should also make us reluctant to stretch the field in which an absolute privilege may be invoked by adopting a very broad view of what may be deemed closely related to the general matters committed to the control or supervision of a public officer.

It seems unnecessary to go into questions as to the constitutional limitations, State and Federal, with which an absolutely privileged power of censorship might conflict.

We conclude that none of the acts complained of (including the statements alleged to have been made) are within the actual field of the defendant's powers or duties as Mayor or so closely related thereto as to be entitled to an absolute privilege, assuming (but not holding) such privilege to be accorded to the holder of that office.

The defendant also alleged as a ground for the demurrer to the first and second counts—that no injury was alleged as a result of the acts alleged in those counts and hence that there was no cause of action. That objection was not pressed in this Court, and appears to have been abandoned.

We now turn to the third and fourth counts.

The third count charges that on November 10, 1955, the defendant "willfully, recklessly, wantonly, maliciously and falsely said in the hearing of divers people that a water-color painting entitled 'In a Room' composed and painted by the Plaintiff was 'morally objectionable', 'obscene', and 'indecent' and used other words charging and understood as charging that said painting was of a pornographic nature, * * *." This count further alleges as the innuendo that by these words the defendant charged that "the Plaintiff was a producer of a morally objectionable, obscene, indecent and a pornographic work of art or painting and that the Plaintiff was a man of bad moral character." The plaintiff then alleges that for more than ten years he has been "a painter and producer of fine works of art" which he has offered and sold, and alleges that he is and from his youth has been of good reputation "for

integrity and propriety of conduct," that he has suffered in name and fame from the "false and malicious" words spoken by the defendant, "and has lost the good will and trade of many good and worthy persons with whom he otherwise may have had profitable business."

The fourth count is generally similar to the third. It undertakes to charge libel, rather than slander, and complains particularly of the words "morally objectionable" and "debasing" which the defendant is alleged to have applied to the painting. We note that the count makes no direct charge of publication of the alleged libel. It says that the defendant "wrote and composed" the scandalous and libelous words complained of on or about December 1, 1955, but the only allegation from which publication might be inferred is to be found in the statement of damages which asserts damage to his reputation and loss of good will and possible trade. The defendant, however, has made no point of this omission of a direct allegation of publication. It could doubtless have been easily cured by amendment.

The defendant's demurrer assigns three objections to both the third and fourth counts. In addition to the claim of absolute privilege, which has been covered by what we have already said, the demurrer asserts as to each of these counts: "That the alleged statements made by the defendant were privileged, as fair comment upon said water color painting"; and "That the innuendo is not supported by the colloquium."

The demurrer based upon the ground of fair comment cannot be sustained. "Fair comment" is often spoken of (perhaps not entirely accurately) as a matter of qualified privilege, and a qualified privilege cannot be raised on demurrer. See *Powell v. American Towing & Lighterage Co.* and *Cobourn v. Moore,* both cited above. The latter was a defamation case involving a newspaper publication.

The final ground of demurrer—that the colloquium does not support the innuendo—presents a more difficult question. An analysis of these counts will show that each purports to assert two causes of action or grounds of liability—one an attack on the plaintiff's character as an individual, the other an attack on his reputation as an artist. The two are so closely blended that it is not easy to dissociate them. The situation seems,

however, somewhat similar to that in *Battersby v. Collier* (App. Div., 1st Dept.), 48 N. Y. S. 976, and in a later stage of the same litigation in the same court reported under the same title in 54 N. Y. S. 363, where a suit by an artist against a publisher was treated as involving two separate claims. There, the publication attacked severely the artistic merit, or lack thereof, of a painting upon which the plaintiff was working, which was intended for exhibition and which was exhibited in its unfinished state to a number of persons, including a representative of the defendant. Largely as a matter of pleading, the plaintiff's claim as an individual was rejected. His claim of libel against him as an artist was also denied. The court said (in the case in 54 N. Y. S. 368), "However skillful an artist may be, it is not a libel upon him to say that any particular picture of his is not good of its kind." The case was disposed of on that issue at the second trial substantially as if on demurrer. The Appellate Division observed that there was no allegation in the complaint that the words complained of were published with any malicious intent. The only allegation of malice was made in connection with the inferences which the plaintiff drew from the words.

A distinction is made between an attack on the work of an author or artist and an attack upon the character of the author or artist himself. See *Merivale v. Carson*, 20 Q. B. D. 275; *Cleveland Leader Printing Co. v. Nethersole* (Ohio Sup. Ct.), 95 N. E. 735; *Dowling v. Livingstone* (Mich. Sup. Ct.), 66 N. W. 225; *Whistler v. Ruskin, The Times,* Nov. 26 and 27, 1878; *Battersby v. Collier, supra; Outcault v. New York Herald Co.* (App. Div., 1st Dept.), 102 N. Y. S. 685. In some cases, however, an attack on the character of the author or artist is held to be included in an attack on his work. Probably the leading case so holding is *Merivale v. Carson, supra.*

In that case the author of a dramatic review criticized a play written by the plaintiffs. Both the meaning of the words used and the limits of fair comment were involved. The case was submitted to the jury, which returned a verdict awarding the plaintiffs damages of sixpence. (They were also allowed costs by the court—doubtless amounting to a considerably larger sum.) The review stated in part: " 'The Whip Hand', the

joint production of Mr. and Mrs. Herman Merivale, gives us nothing but a hash-up of ingredients which have been used ad nauseam, until one rises in protestation against the loving, confiding, fatuous husband with the naughty wife and her double existence, the good male genius, the limp aristocrat, and the villainous foreigner."

Opinions were delivered in the Court of Appeal by Lord Esher, M. R. and by Bowen, L. J. The former said (in part, at page 281): "* * * I cannot doubt that the jury were justified in coming to the conclusion to which they did come, when once they had made up their minds as to the meaning of the words used in the article, viz. that the plaintiffs had written an obscene play, and no fair man could have said that. There was therefore a complete misdescription of the plaintiffs' work, and the inevitable conclusion was that an imputation was cast upon the character of the authors."

Bowen, L. J. said that the verdict of the jury had settled the meaning of the review and had determined that the writer of the criticism "has imputed to the plaintiffs that the story of their play turns in its main incident upon an adulterous wife, and in such a way as not to lead anyone to suppose that the plaintiffs objected to the adultery, but, on the contrary, that they had treated the adultery as a spicy incident in the play without expressing any opinion as to its morality." To this he added: "It has been admitted by the defendant that the play does not in fact contain any adulterous wife, there is no incident of adultery in it, and therefore it is not open to the suggestion that the plaintiffs have treated adultery lightly in such a way as to tend to immorality." In discussing the limits of fair criticism he spoke of "misdescription of the work" and continued: "There is all the difference in the world between saying that you disapprove of the character of a work, and that you think it has an evil tendency, and saying that a work treats adultery cavalierly, when in fact there is no adultery at all in the story. A jury would have a right to consider the latter beyond the limits of fair criticism. * * * Assuming the interpretation the jury put on the meaning of the words to be correct, * * * I entertain no doubt as to the correctness of the remainder of the verdict. And, * * * the misrepresenta-

tion being clear, the writer having not merely said that the play had an evil tendency, but having imputed to the authors that it was founded on adultery when there is no adultery at all in it, the jury would have inferred, if the question had been left sufficiently to them, that the writer was actuated by a malicious motive; that is to say, by some motive other than that of a pure expression of a critic's real opinion." (20 Q. B. D., at 282, 284, 285.)

The appellant relies heavily upon *Merivale v. Carson, supra,* and on *Whistler v. Ruskin, supra.* The latter case contained a virtual charge of fraud against the artist, in the statement that the purchaser of his works "ought not to have admitted works into the gallery in which the ill-educated conceit of the artist so nearly approached the aspect of wilful imposture." *Wittenberg, Dangerous Words, A Guide to the Law of Libel,* page 113, says: "The words 'wilful imposture' were held by the jury (for it was left to the jury) to be a false aspersion or statement of fact involving the personal integrity of the plaintiff, and not an expression of opinion concerning his art or him as an artist."

The plaintiff also relies upon *Reade v. Sweetzer,* reported in a note in 6 Abb. Pr. N. S. (N. Y.) 9. There the criticisms upon which that suit was based (among other things) described the plaintiff's book as "one of the worst stories that had been printed since Sterne, Fielding and Smollet defiled the literature of the already foul eighteenth century." It added that the book was "not only tainted with * * * one foul spot; it is replete with impurity; it reeks with allusions that the most prurient scandalmonger would hesitate to make." The language quoted, we think, goes beyond mere criticism of the author's work and carries the attack through to the character of the author. In giving his charge to the jury, Justice Clerke said in part (p. 20): "* * * in dealing with this kind of literature the critic should not be prevented from inferring the motives and designs of the author from the inevitable effect of his writings. Of course, if he imputes motives and designs which he was not warranted in imputing by any opinion or sentiments expressed, or any character

delineated in the work, or from its general tone, he is liable, and must take the consequences, and the author is entitled to redress. To charge an author with such motives and designs is a most serious imputation, and if it is unwarranted the critic has committed a grievous wrong, which money is scarcely capable of repairing. Undoubtedly, the criticisms complained of make these imputations against the plaintiff." The case resulted in a verdict for the plaintiff, for damages of six cents. The issue of justification was also submitted to the jury. There was another charge of libel based upon a different article which was said to impute fraud to the plaintiff. The basis of the jury's verdict is not shown.

The defendant relies upon the following cases in support of his contention that the alleged attack on the plaintiff's painting does not constitute an attack on the plaintiff's character. *Cleveland Leader Printing Co. v. Nethersole, Dowling v. Livingstone, Battersby v. Collier,* and *Outcault v. New York Herald Co.,* above cited.

In the *Cleveland Leader v. Nethersole Case,* a newspaper published a commentary upon a series of plays in which the plaintiff had appeared which stated: "* * * last week * * * the whole Nethersolian repertory failed to provide a helpful situation or one that was not tarred with suggestiveness. All the plays left nasty tastes in the memory. As I recall them, 'The Labyrinth' was the worst of the lot. Cleveland received it frigidly * * * but when it was produced in London it was hissed so soundly that Miss Nethersole had hysterics. * * * We can guard against these brazen, fleshly plays, however. * * * The greater evil lies in the subtle undermining of the character which follows upon laughing attacks made upon domestic life." The Supreme Court of Ohio held that a verdict for the defendant should have been directed and held that the attack was on the play, not on the actress and did not charge her with any lack of character either personally or in her profession. Much of the persuasive force of this decision, as applied to the instant case, disappears when it is noted that among the important reasons for holding that a verdict should have been directed for the defendant are that, at the end of the trial, there was no showing of actual malice and there was no

proof of special damage. Both are alleged here and are admitted on demurrer.

*Dowling v. Livingstone, supra,* involved a similar point. There a review of a book on an economic-social subject stated that one of the things which the plaintiff-author advocated "like all quack remedies, would intensify the trouble if it had any effect at all." The author claimed that this characterized him as a "quack." The court noted the absence of an innuendo and held the direct reference to the author's "quack remedies" not to be libelous *per se.*

*Battersby v. Collier, supra,* has already been commented upon rather fully. It could hardly be contended that the assertion that an artist had painted a bad picture meant that he was a bad man, and the case turned largely on pleading.

*Outcault v. New York Herald Co., supra,* was a suit for libel by a cartoonist against a newspaper. The cartoons involved were "Buster Brown and his dog Tige." The substance of the comments complained of was that the cartoonist had run out of ideas and was not willing to attempt something new. No "innuendo" was alleged in the complaint. The plaintiff claimed that the article attacked him in his general capacity as an artist. It was held that the words were susceptible of a non-defamatory meaning—that the cartoonist had unavoidably run into sameness through the long continuance of this series of cartoons, but that if he would turn to something new, he would achieve new success. The derogatory meaning which the plaintiff attacked was held not to be a necessary conclusion from the words used. An order which had overruled a demurrer was accordingly reversed, but the case was remanded with leave to the plaintiff to amend—presumably to add the innuendo.

There appear to be no Maryland cases in point on this subject. Whether or not the words complained of constitute slander or libel is a question for the court and hence may be determined on demurrer. *Haines v. Campbell,* 74 Md. 158, 21 A. 702; *Avirett v. State,* 76 Md. 510, 25 A. 676, 987; *Lewis v. Daily News Co.,* 81 Md. 466, 32 A. 246; *Kilgour v. Evening Star Co.,* 96 Md. 16, 53 A. 716; *Weeks v. News Pub-*

*lishing Co.,* 117 Md. 126, 83 A. 162; *Flaks v. Clark,* 143 Md. 377, 122 A. 383; *Bowie v. Evening News,* 148 Md. 569, 129 A. 797; *Cobourn v. Moore, supra.*

In the *Cobourn Case* it was held not libelous to say that a lawyer charged high fees. In the *Weeks Case,* the term "black sheep" as applied to an attorney in a political article was held not libelous, where it was held to have been used in contradistinction to certain criminal classes mentioned in the same article and there was no allegation that it had been intended or understood as meaning a criminal character.

An innuendo cannot "introduce new matter, or enlarge or add to the sense of the words declared on, or properly impute to them a meaning not justified by the publication, either when taken alone or in connection with the inducement and *colloquium.*" *Weeks v. News Publishing Co., supra,* 117 Md. at 131. See also the cases therein cited.

Though we think the question a close one, we cannot say as a matter of law that it does not constitute a reflection on the character of an artist, and not merely on his work, to say that he has painted an obscene picture.

Perhaps this question is somewhat academic in view of the allegations of the declaration to the effect that the accusation of having painted an obscene picture has injured the plaintiff's reputation and standing and his trade with purchasers or prospective purchasers of his paintings. Such loss is alleged by way of special damage. If the words are not considered libelous *per se*—in which case no innuendo is necessary—they may be actionable if coupled with allegations of special damage as being libelous *per quod.* See *Bowie v. Evening News,* 148 Md. 569, 129 A. 797, above referred to, in which Judge Offutt gave a very full and illuminating review of the law of libel. See also *Stannard v. Wilcox & Gibbs Sewing Machine Co.,* 118 Md. 151, 84 A. 335, which shows the necessity that words to be libelous *per se* as damaging to the plaintiff in his business, occupation or profession, must be shown to have reference to him in that capacity.

One aspect of "fair comment" seems to call for notice. In *Hoeppner v. Dunkirk Printing Co.,* 254 N. Y. 95, 172 N. E. 139, 72 A. L. R. 913, it was held that where the complaint

showed on its face that the articles complained of as libelous dealt with a subject of public interest, criticism (in that case newspaper criticism) fairly and honestly made is not libelous, and the law of "fair comment" applies without having to be pleaded as a matter of defense, but if the complaint does not so show, "fair comment" must be raised as a defense in the nature of special privilege. If, however, the public interest in the matter does appear from the complaint (as it did in that case), but the complaint expressly alleges malice, the defense of "fair comment" must be asserted affirmatively. To like effect see *Thomas v. Bradbury, Agnew & Co., Ltd.* [1906], 2 K. B. [C. A.], 627, at 640. That case involved a book review which appeared in "Punch". In the instant case malice is expressly alleged in each of the defamation counts.

In conclusion, we think that on the record, as the case comes before us, the plaintiff has alleged a cause of action in each count of the declaration (subject to the possible insufficiency mentioned above of the allegation of publication in the count for libel), that the defendant is not entitled to an absolute privilege barring the action, and that at this stage of proceedings the defense of "fair comment" or qualified privilege or justification is not before us. Accordingly, the judgment appealed from and the order sustaining the demurrer must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

> *Judgment reversed and order sustaining demurrer reversed and case remanded for further proceedings not inconsistent with the opinion of this court; costs to abide the outcome.*