HENRY T. ARRINGTON et al. v. CHARLES
EDWARD MOORE

[No. 958, September Term, 1975.]

*Decided May 7, 1976.*

The cause was argued before THOMPSON, POWERS and LOWE, JJ.

*James E. Fannon, Jr.* for appellant, Henry T. Arrington. *Patrick A. O'Doherty* for other appellants.

*Victor A. Houlon*, with whom were *Robert J. Cerullo* and *Pickett, Houlon & Berman* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

We are asked to determine at what point the exercise of authority by a presiding officer at a public meeting may cause him to become civilly liable. We must also determine when an arresting officer may be so exposed to liability. The community in which the circumstances giving rise to this case occurred carries the delightful name of "Seat Pleasant." To the Mayor, Henry T. Arrington, the seat occupied by him, while chairing the town meeting in question was anything but that. Meetings of the Mayor and Council of Seat Pleasant are held bimonthly. Alternate meetings are open to public attendance and participation. All of the meetings are presided over by the Mayor.

Suit was filed in the Circuit Court for Prince George's County by Charles Edward Moore, the Town Manager, against Mayor Arrington, as well as Chief of Police Roy Burke and Deputy Charles L. Owens, for assault, battery and false arrest. The testimony at trial revealed the heated political divisiveness within the community which led to the incident at bar. This divisiveness was exemplified by the meeting of the Mayor and Council preceding the one at issue. After persistent interruptions, the Mayor abruptly adjourned that meeting, and then seemingly felt it necessary to draw a pistol when going to his car in an adjacent parking lot in the presence of some protesting townspeople.

At the next meeting after the pistol wielding incident,

held on August 16, 1973, there was expected even greater and more vociferous public participation. The anticipated public participation was viewed with some trepidation because a printed "flyer" entitled "SEAT PLEASANT MURDERERS" had been disseminated exhorting townspeople to attend the August 16th meeting. Among other charges made by the flyer (which we attach as Appendix No. 1) was that of governmental overspending including " . . . full-time pay of a part-time manager." The meeting room was thus prepared for substantial attendance by the public and news media. Chief of Police Burke was alerted by the Mayor to have a sufficient number of officers present to maintain order. A total of seven (including himself) was present, most of whom were inconspicuously clothed.

The testimony in the case indicated that the Mayor had generally conducted meetings "with some parliamentary procedure" although he deviated from "parliamentary procedure and Robert's Rules . . . to allow people an opportunity . . . to voice their opinions." In short, it appears that the meetings were generally informal, with the degree of procedural adherence dictated by the circumstances of the particular meeting.

The air was so charged with political cordite at the meeting of August 16, 1973, that as a precaution, in addition to added police security provided, a section of law was prefatorily read to the assembled throng. The Mayor described the preparations.

> "We opened the meeting by reading a section of the Code, the Annotated Code of the State of Maryland, which indicated that it was a violation of the law to disrupt a public meeting. After having read that, I stated to the public that the meeting would be held with dignity and decorum, that everyone would be allowed to speak, that we had no intentions of suppressing anyone's opinions. But that it would be done in an orderly fashion, and that I would attempt to recognize people in the order in which their hands were raised."

A Councilman Gallion was then recognized by the Mayor and he took the floor to denounce the political flyer that had been publicly circulated. In doing so he read from the flyer, and when he reached that portion critical of the town manager, appellee Moore rose from his seat to the right rear of the Mayor [1] and approached him. The testimony differs as to his manner of seeking the Mayor's attention, but Moore clearly stated his purpose in doing so.

"BY MR. HOULON:

Q. What if anything next did you do after you got up?

A. I walked where I could make sure he would hear me.

Q. Am I standing approximately where you were?

A. I'd say back a bit. About two feet, probably.

Q. Here?

A. Right, and then —

Q. Then what did you do? Tell me.

A. I put my hand on the table.

Q. Your hand?

A. Right. That is a habit of mine, of talking with my hand and doing things. I wanted to make darned sure that he heard what I had to say.

Q. What did you say?

A. 'Am I a part-time manager?'

Q. And in what tone of voice did you use?

A. The same as I just said now. 'Am I a part-time manager?'

Q. How many times did you say it, if any?

A. I asked him that five times.

Q. Five times?

---

1. The council were seated in an inverted horseshoe arrangement with the public at the head and Mayor at the toe. The manager did not sit with the spectators, nor with the councilmen, but was seated behind and to the right of the presiding officer.

A. Yes. Five times, but on three times he said, 'Take a seat, Mr. Moore,' and on the fourth time he said, 'Get him out of here.'

Q. When he said, 'Get him out of here,' could you tell who he was speaking to?

A. No. I couldn't. But I assumed that he meant Chief Burke because he came in the space between you and the man, now, between the two of us. And he put his hand on my chest, so I pushed him back."

It is undisputed that Chief Burke came forward, placed himself between appellee and Mayor Arrington, and put his hands on appellee's chest:

"Q. When Chief Burke came up to you, he put his hand on you?

A. Both hands, yes.

Q. Tell the jury what happened next.

A. Well, I did not mean to disobey the law at all, but for me to ask a question where I'm being accused of being a part-time manager, which is wrong, and then not to receive an answer but to be told — but to hear him say, 'Get him out of here,' deep in my own heart I felt I should get an answer then.

So I waited. And Chief Burke pushed me and by being an ex-Army man, I immediately, my hand came up to defend myself. And we had a bit of a shuffle there until all of a sudden one officer grabbed my hand. And then the Chief had the other hand and all of a sudden I felt an arm around my neck."

Mr. Moore testified that he not only knew the Chief, but that they were on good terms, although the manager's own description of the "shuffle" belies that relationship.

"Q. And tell the jury what you did to the police officer? How you resisted? Tell them what you did to him. You took his coat, what did you do?

"A. Pulled it over his head.

Q. You pulled the coat over his head? What did you do to him then?

A. Just held him until I was choked.

Q. Didn't he go down?

A. He went down on one knee.

Q. Your hands were on him when he went down?

A. I couldn't turn him loose because I had him there.

Q. Okay. You had him. And you had his coat over his head and you had him down on one knee? Is that correct?

A. I didn't have it — him down. He went down on one knee.

Q. He went down on one knee, but you had your hands on him?

A. I didn't push him down."

Notwithstanding the fact that Councilman Gallion had not yielded the floor, nor had the Mayor (whom he acknowledged was Chairman of the meeting) recognized him, Town Manager Moore felt that the time was appropriate to demand an answer to his question from the Mayor.

"Q. You knew what the law was, that you were not to disrupt the meeting? It had been read out and you heard it well. Then why did you go over and insist that at that time before the television cameras and before everybody else, and while the Councilman was on the floor, why did you insist then that he was going to have to answer you then?

A. Because I felt that that was the time I should have been answered. Without disrupting the meeting."

Even when the police chief intervened, Manager Moore

continued to insist that he had a right to be heard at that moment.

"Q. Well, what were you doing when the police officer was moving you back? Didn't you just — did you move back out of the way? Or did you resist it?

A. Has it ever occurred to you that I was top man? I shouldn't have been manhandled by a police chief?

Q. He just had his hand on your chest?

A. With the instructions to, 'Get him out of here.'

Q. Then you persisted, didn't you? You figured you were the Town Manager?

A. I figured I knew I was."

Deputy Owens and another officer, seeing their Chief apparently overcome, subdued the manager, first by an arm lock around the neck from behind, then with handcuffs, after which he was removed from the building.

The news media duly recorded these events and a film taken by a television station was shown the jury. In addition, two sets of photographs were admitted as evidence, one set introduced by appellants and the other by appellee. We have appended them as Appendices No. 2 and 3 respectively.

After consulting the State's Attorney of Prince George's County, Chief Burke and Deputy Owens charged Mr. Moore with violation of Md. Code, Art. 27, § 577A (2) — refusing to leave a public building upon request. After some postponement, the case was submitted to the District Court Judge, by agreement, solely upon the viewing of the televised film clip. Mr. Moore was found not guilty. His legal fees and other costs totalled $1150.00. Thereafter, Mr. Moore sued the Mayor, the Chief of Police and Deputy Owens for assault and battery, false arrest, and libel, praying $3,000,000 on each count. This appeal is from a verdict of $4500 awarded Moore as compensatory damages for assault and battery and false arrest.

Several issues are raised on appeal relating to the immunity of public officers, sufficiency of the evidence, and the propriety of the judge's supplemental damage instructions. We find it necessary to address only the immunity issue.

## Immunity of Public Officers

The protection of public officers from liability for actions taken as part of their official duties is recognized in Maryland. As the Court of Appeals has stated:

> "In Maryland governmental immunity is extended to all *nonmalicious acts* of *public officials* as opposed to *public employees* when acting *in a discretionary* as opposed to ministerial *capacity*." (Emphasis partially added). *Duncan v. Koustenis,* 260 Md. 98, 104.

Therefore, no liability may be imposed against appellants if they were public officers acting in a discretionary capacity, and their actions were without malice towards Moore.

The tests to be applied in determining whether one is a "public officer" so as to be protected by governmental immunity were summarized in *Duncan, supra:*

> "There are many Maryland cases dealing with the delineation of the public official concept and the following tests have been set forth: '[I]s he required to take an official oath; is he issued a commission; is a bond required; is the position called an office; is the position one of dignity and importance; does the public servant exercise in his own right some of the sovereign powers of government for the benefit of the public; does he have a fixed tenure?' *Gary v. Board of Trustees,* 223 Md. 446, 449, 165 A. 2d 475 (1960)." 260 Md. at 105.

The appellants in this case are unquestionably public officials. Appellant Arrington was the elected Mayor of Seat Pleasant and was vested with the duty to carry out the governmental functions of that municipal corporation. See

*Walker v. D'Alesandro*, 212 Md. 163, 170. Appellants Burke and Owens were Chief and Deputy Chief of Police, respectively, and it is clear that policemen are public officials. *Robinson v. Bd. of County Comm'rs*, 262 Md. 342, 347; *Harris v. Baltimore*, 151 Md. 11.

We must then determine, viewing the evidence in the light most favorable to appellee, 1) whether the appellants were acting within their discretionary capacities and 2) whether there was evidence that their conduct was motivated by actual malice, so as to remove their actions from the protection of governmental immunity.[2]

### Discretionary Capacities

The evidence adduced clearly indicated that the Mayor of Seat Pleasant was the presiding officer at all the meetings of the Common Council. See also Public Local Laws of Prince George's County, § 68-12. Inherent in that responsibility is the authority to maintain order. McQuillin, in his treatise, *The Law of Municipal Corporations*, states that "[i]t is always the duty of the presiding officer [at council meetings] to enforce the law or rules applicable to the body, keep order, and follow the course of the proceedings." § 13.21 (3d ed. by Jerome H. Dray).

A case based upon remarkably similar facts was decided in 1837 by the Supreme Court of New York in *Parsons & Hall v. Brainard*, 17 Wend. 522. There, Parsons, the justice of the peace, was presiding, with two other justices, at a town meeting at which Brainard was elected to the office of "hog-howard."[3] Brainard thereupon nominated Parsons as "hog-howard's waiter," producing "noise, laughter and

---

2. Although there is some indication that in some jurisdictions immunity from civil liability exists even if the officer acted with malice (at least as to judicial officers and inferentially to other public officials, see Annotation, 173 A.L.R. 802; 13 A.L.R. 1344), in Maryland it is clear that public officials acting within their discretionary capacity enjoy immunity only if they act without malice. Robinson v. Bd. of County Comm'rs, 262 Md. 342, 347; Duncan v. Koustenis, 260 Md. 98, 104; Eliason v. Funk, 233 Md. 351, 356; Carr v. Watkins, 227 Md. 578, 585.

3. " . . . (whose duty it seems was understood to be, to catch hogs running at large and put rings in their noses.)" *Parsons & Hall v. Brainard, supra*, at 522.

confusion." Parsons then directed the constable in attendance, Hall, to remove Brainard from the meeting. Brainard subsequently sued Parsons and Hall for assault, battery and false imprisonment and Parsons and Hall appealed from the judgment of a jury holding them liable to Brainard. The Court reversed the judgment below, stating:

> "By the statute, the justices are to preside at the town meeting, and see that the same is orderly and regularly conducted. . . . They have full authority to maintain regularity and order, and to enforce obedience to their lawful commands. . . . The case called for a prompt exercise of their authority, and I can perceive no objection in principle to the manner in which it was exercised. . . . [T]he means of maintaining order are left to the discretion of the presiding officers." At 523-524.

See also *Doggett v. Hooper,* 27 N.E.2d 737 (Mass.) wherein the Supreme Court of Massachusetts upheld the right of the moderator at a town meeting to order the removal of one who persists in disorderly behavior.

In short, it would be absurd to say that an official charged with the responsibility of presiding over a public body has no discretion or implied authority to maintain the order and dignity becoming that body. *Cf. Williams and Fulwood v. Director,* 276 Md. 272, 304; *Restivo v. Princeton Constr. Co.,* 223 Md. 516, 525.

The evidence indicated that Mayor Arrington sought to conduct the meetings formally enough to maintain respect for the dignity of the Common Council and himself as Mayor, but informally enough to comport with the atmosphere of a relatively small community. He denied that those in attendance at public meetings were ever allowed to speak out without being formally recognized.

> "Q. . . . How many meetings had you conducted of the Council prior to this one?
>
> A. I had conducted all the meetings, sir.
>
> Q. Did you run them as Mr. Somerville and Mrs.

Radivo and Mrs. Jones and Mr. Moore testified, sometimes under formal rules and sometimes under whatever rules you preferred?

A. No, sir. I did not.

Q. You always ran them according to Robert's Rules of Order?

A. No, sir. I did not.

Q. You always ran them pursuant to the set of parliamentary procedure rules?

A. I always ran them with some parliamentary procedure and the deviation from parliamentary procedure and Robert's Rules was to allow people an opportunity as I explained earlier to voice their opinions.

In fact, there have been times when both the lady who testified and Mr. Somerville have had something they wanted to get off their chest and I have allowed them five to ten minutes to take the floor and let them steam off. This is a policy we have had in the town. There have been people who have come to the meetings and completely dominated it. I have permitted this so that I would not be accused of suppressing freedom of speech. And I think that —

Q. So you have, in fact, varied from parliamentary procedure, Robert's Rules of Order —

A. Yes, particularly with those people who were prone to criticize my administration.

Q. Then it would be nothing unusual for somebody to speak out without being formally recognized by the chair?

A. No, sir. I always recognized them. If I did not recognize them, there have been occasions when people have gotten up to speak and they have talked for maybe three or four minutes. After me recognizing them, then they'll ask to talk again. I have recognized them and on a third time I have

told them that they have spoken. They have dominated the meeting. And I would not recognize them.

They have insisted on being recognized. I said, and I think that Mr. Moore can attest to this, I have said to them that, 'Listen, you spoke. Somebody has to talk, and I will not recognize you. Will you please be seated?'

They have told me they would not sit down, that they were taxpayers and they would not sit down. And I said that the meeting would not proceed until we maintained some order and they said, 'Well, I'm not going to sit down. I'm a taxpayer. You can't stop me from talking. I'm going to talk all night if I want to.' And as a result of that kind of behavior, we had another person who disrupted the meeting just as the Plaintiff here did who went to the District Court and was put on the stet docket for the same thing after me pleading with her for five minutes to sit down. So I have been very patient. And I have been very understanding in conducting my meetings.

I have not tried to run a dictatorial type town meeting at all, and if that is the implication that you are making, I think it is unfair."

However, when such leniency was abused, the Mayor did not hesitate to exercise his responsibility to maintain the dignity of the meeting:

"Q. Have you ever in conducting any of the town meetings that you have conducted had anybody speak out without being recognized by the Mayor?

A. Yes, sir. And I had them arrested.

Q. Thank you. Has anybody ever spoken out and not been arrested?

A. Yes, sir.

Q. So it depends on whether you feel like having him arrested?

A. No, sir. It depends on how long they speak out.

Q. Who determines how long is how long, you?

A. Well, since I'm responsible for conducting the meeting, I would assume that it would be me."

The Mayor had also used other methods to keep the peace at previous meetings. On at least one occasion, when he felt he was losing control of the proceedings, he simply terminated the meeting. It is clearly within the discretionary capacity of a presiding officer of a public body to insist upon the orderly recognition of speakers,[4] and to make quick judgments as to what method to use to maintain order at emotionally charged meetings.

As to the Chief of Police and his deputy, we will judicially notice that their office charges them with the responsibility of preserving the peace. The evidence shows that they were ordered by the Mayor to be present at the meeting for that purpose in anticipation of problems which might arise in the heat of public debate in the politically tense atmosphere. It is surely within an officer's discretionary capacity to intervene between two persons in close proximity with each other and who are by all appearances intensely at odds. This is particularly true under the circumstances of an emotionally charged public meeting when the subject of controversy appears about to accost the presiding officer. When, upon instruction of the presiding officer, Moore refused to return to the place he had assigned himself,[5] the

---

4. This procedure is described in *Jefferson's Manual*, § 354.

"When any Member means to speak, *he is to stand up in his place*, uncovered, and to address himself, not to the House, or any particular Member, but to the Speaker, who calls him by his name, that the House may take notice who it is that speaks. . . . But Members who are indisposed may be indulged to speak sitting." (Emphasis added).

5.

"As Town Manager I was responsible for having the room prepared for the meeting and I had checked the public address systems, getting everything in line for the meeting. And I was getting everything prepared so that once the people began to come in it would be prepared for the meeting."

Mayor did not exceed his discretion by ordering his removal; nor did the Chief of Police exceed his, by intervening between the two and placing his hands upon the chest of the offending party.

By his own admission, Mr. Moore then precipitated any further force by his own physical resistence. He testified that he was so affronted that the chief would "manhandle" him, the town manager, that he pulled the police chief's coat over his head; causing the chief to fall to his knee. Upon seeing a fellow officer in apparent distress, Deputy Owens precipitously rushed to his chief's aid and "collared" appellee with a neck hold in order to subdue him. Under these circumstances, we cannot find that such action was beyond a law enforcement officer's discretion.

The enforcement of law is best carried out when crime or violence is prevented, not merely when a perpetrator is permitted to act and then is apprehended. If law enforcement officers are compelled to keep the peace at their peril, without some discretion as to how to respond to an apparent crisis, the peace will simply not be kept. Violators may be subsequently apprehended but persons and property may well suffer for the delay. The testimony of Mr. Moore [6] and the photographs he introduced vividly exhibit that disorder was imminent. Officers must not be forced to hesitate until a blow is struck or a shot is fired when protecting the lives and property of public officials. In 1871 the Court of Appeals held that public officials (*i.e.*, an elections judge) could not be held legally responsible for anything more than an honest and faithful exercise of judgment,

> " . . . and are not liable for the consequences of mistakes honestly made, but are liable, both civilly and criminally, for a wrong which they wilfully, fraudulently or corruptly perpetrate." *Friend v. Hamill*, 34 Md. 298, 304.

---

6. Appellee testified that he knew of the potential for disruptions in the meeting saying " . . . there was so much chaos in that town at that time, I wouldn't be surprised about anything."

We see no abuse in the discretionary exercise of authority by any of the appellants.

## Malice

Appellee contends that because he was ultimately found not guilty of the only charge against him, refusing to leave a public building upon request, all that went before and all that came after was presumptively malicious.[7] We do not

7. Appellee argued on motion for directed verdict:

"MR. HOULON: As the Court can, I think, clearly see from the testimony thus far, and, of course, I'm sure the Court is cognizant that you must consider these motions being made by the Defendants in the light most favorable to the Plaintiff, Mr. Moore.

Even with that burden or that test in effect at this posture on motions for directed verdicts, this man was not taken up because he walked over to the Mayor, because he asked a question without being recognized by the floor, because he acted in a disorderly manner. This man as a matter of record and as a matter of evidence in this case was taken up because he refused to leave a building when requested to do so. The testimony is clear, uncontradicted, uncontroverted, that he was never asked to leave that room, never asked to leave that building, that the Mayor said 'Get him out of here.'

He never told him you must leave this building. He just said, 'Get him out of here.' The police officer came, swept him up and took him out.

Now, that is the crux of the case. He had people lay their hands upon him without his permission or consent. He was arrested because he did not leave the room, but he was not asked to do so. And that is the Plaintiff's case, because the Statute that these Defendants charged him under requires that one must be asked to leave the room or leave the building before this charge would lie. That is exactly why he was found not guilty in the District Court. Because they had not requested him to leave the room.

Now, if they didn't request him to leave the room, then what they did to him was totally without legal justification and if they do something to him without legal justification, that is malice, per se. That is like a police officer that is just like Chief Burke comes over to me right now accusing me of possessing a firearm and arresting me. He's maybe putting his hand on me in the furtherance of that arrest. He's arresting me and he's doing so upon something that he has absolutely no legal justification for. And that is exactly analogous to this situation.

The crime that this man was arrested for, the crime that they laid their hands upon him for, was failure to not leave a public building when requested to do so. And the case thus far at this point in the testimony is just as I said, uncontroverted that he was not asked to leave the building, and therefore, Mayor Arrington when he told Chief Burke and the other officers to get him out of here, was clearly acting out of line and therefore maliciously because he had no legal justification and so did Owens and Burke, because they were simply the agents of the Mayor."

agree. If there existed probable cause [8] to arrest appellee upon any reasonable ground, the fact that each element of the particular crime with which appellee was later charged was not proved, does not automatically prove malice.[9]

The Court of Appeals, in a case involving a suit against a police officer for malicious prosecution, recently acknowledged in *Brewer v. Mele*, 267 Md. 437, 445, that it had:

" ... never been called upon to decide that quality of malice or the means of its proof necessary to forestall governmental immunity."

The Court went on to imply that malice might be "some affirmative showing of ill will, improper motivation, or evil purpose . . .", on the one hand, or simply a "mere inference of malice permitted to be drawn from the want of probable cause . . ." on the other. The Court pointed to the illogic of the latter course "which is no immunity at all, but a defense upon the merits," *id.* at 446. Under either test, the appellee here failed to pull back the cloak of immunity from the appellants. Appellee persisted in violating the decorum of a public meeting, with conduct approaching, if not amounting to, disturbing the peace at a public place, Md. Code, Art. 27, § 122. He cannot now protest that such conduct did not provide probable cause for his arrest and/or his precipitous removal from the hall.

Since these facts fall well outside either of the extremes proposed for proof of malice provided us by the Court of Appeals in *Brewer v. Mele, supra,*[10] we have no cause to provide a narrower definition of malice. It will suffice to

---

**8.** "[T]he rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." Edwardsen v. State, 243 Md. 131, 136.

**9.** It is also significant here that although appellee at this juncture claims language in his declaration suffices to allege malicious prosecution, no instruction was given nor asked to be given to the jury for that tort. We confine our opinion to the concepts relied upon by all parties throughout, *i.e.,* false arrest, assault and battery.

**10.** Although the dicta in Brewer, *supra,* refers to the tort of malicious prosecution, we find it applicable as well to the tort of false arrest.

note here only that the Court of Appeals has sufficiently guided us in defining malice for other purposes:

"Actual or express malice — at least in this context — has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *H & R Block, Inc. v. Testerman*, 275 Md. 36, 43. See also cases cited therein.

The actions of the public officials here did not approach that extreme. There was *no* evidence of any evil or rancorous motive influenced by hate and certainly nothing to show a deliberate and willful injury. Beyond that, there was no evidence that the actions taken by appellants were without legal justification. Nor was there a hint of evidence of actual malice in the sense of ill will, improper motivation or evil purpose as noted in *Brewer v. Mele, supra*. Never did appellee's evidence attribute any such motives to the Mayor. To the contrary, he testified that he worked with the Mayor and Council and that, because he was employed full time by the federal government in the evenings, the Mayor had taken over some of his duties so that they were fully performed. As to the other two appellants, he stated that he knew of no reason for their conduct. Indeed, he had been, and still considered himself to be, a friend of Chief Burke.

The basis of the immunity of public officials from tort liability is that a public purpose is served by according that protection to the exercise of official discretion. *Walker v. D'Alesandro*, 212 Md. at 169. The maintenance of order and public peace often, as here, calls for decisiveness and precipitous action. To demand of all public officials under circumstances of apparent crisis the reflection and deliberation allowed an appellate judge may well leave disaster in its wake.

*Judgment reversed.*
*Costs to be paid by appellee.*

# SEAT PLEASANT
# MURDERERS

THE TOWN OF SEAT PLEASANT IS BEING KILLED. YOUR TOWN, BY A SMALL GROUP OF NARROW MINDED, POWER HUNGRY, UNINFORMED AND SEEMINGLY UNCONCERNED INDIVIDUALS.

# THEY CAN BE STOPPED

- *STOP* THE EXPLOITATION OF YOUR CHILDREN
- *STOP* PAYING FOR THE UNAUTHORIZED LEAVES AND VACATIONS OF ELECTED COUNCILMEN AND EMPLOYEES WITH YOUR TAX DOLLARS
- *STOP* THE SPENDING OF YOUR MONEY BY PEOPLE WHO DON'T HAVE THE AUTHORIZATION
- *STOP* THE FULL-TIME PAY OF A PART-TIME MANAGER

IF YOU DON'T LIKE IT, AND DON'T WANT IT, IF YOU WANT IT STOPPED.......

GET UP OFF OF YOUR ASPIRATION AND BE AT......
TOWN HALL THURSDAY, AUGUST 16, 1973 8:00 P.M.

PLAINTIFF'S EXHIBIT
#1 ad
Law 57.873

—Star News Photographer Geoffrey Gubert

## CHAOS CONTINUES IN SEAT PLEASANT

Last night's Town Council meeting in Seat Pleasant ended abruptly when Town Manager Charles Moore confronted Mayor Henry Arrington (top left, seated), then took a swing at Police Chief Roy Burke (top right) before he was subdued, marking the latest incident in the struggles of the community. (Story on B-1.)