## DOWLING *v.* LIVINGSTONE.

1. LIBEL—BOOK REVIEW—RIGHT OF CRITICISM.

When an author places his book before the public, he invites criticism; and, however hostile that criticism may be, and however much damage it may cause him by preventing the sale of the book, the critic is not liable in an action for libel, provided he makes no misstatement of any material facts contained in the book, and does not attack the character of the author.

2. SAME.

The author of a book entitled, "The Wage-Worker's Remedy," left a copy at the editorial rooms of a newspaper, with the request that it be reviewed, which was done; and, in a suit by the author against the proprietors of the paper for libel, the court, in reversing a judgment in favor of the plaintiff, *held:*

(1) That it was error to instruct the jury that "the defendants had the right to ridicule the book if, in the candid judgment of any fair man, the book or any part of it deserved ridicule;" the correct rule being that, when the author is correctly stated, the critic is the sole judge of the language of his criticism.

(2) That the statement that the plaintiff had quoted from another author without giving him credit did not amount to a charge of plagiarism, it appearing that the quotation referred to was inclosed in quotation marks, but was not credited to said author by name.

(3) That a reference to the argument in the book that a minimum rate of wages should be fixed at $2 per day, to which was added the statement that, "of course, like all quack remedies, the one suggested would intensify the trouble, if it had any effect at all," was not equivalent to charging that the plaintiff was a quack.

(4) That a reference to the recommendation in the book of legislation prohibiting the acquirement of more land by any man than he actually needs for business or homestead purposes, coupled with the statement that it had not the merit of originality, as Horace Greeley had advocated the same thing 50 years ago, was not libelous, even though it should appear that Mr. Greeley never advocated such a doctrine.

(5) That plaintiff's complaint of the statement that "he denounces the single-tax scheme as robbery" was unfounded, as, in that part of the book to which such statement had reference, plaintiff, in discussing the single-tax theory of Mr. George, denounced his proposition to take the land from the present owner without compensation, characterizing it as "a gigantic piece of robbery;" and, furthermore, the critic thereupon proceeded to state plaintiff's position upon that subject fully and correctly.

Error to Wayne; Carpenter, J. Submitted January 8, 1896. Decided February 18, 1896.

Case by Morgan E. Dowling against William Livingstone, Jr., and others, for libel. From a judgment for plaintiff, defendants bring error. Reversed.

Plaintiff published a book entitled "The Wage-Worker's remedy," which was offered for sale to the public generally. The defendants are the publishers and owners of the Detroit Journal, a newspaper printed and published in the city of Detroit. Plaintiff took this book to the editorial room of the Journal, and requested that it be reviewed. The book was handed by the managing editor to an employé for that purpose. A review was written and published May 15, 1894, and is as follows:

"MR. DOWLING'S BOOK.

"The Wage-Worker's Remedy.

"Morgan E. Dowling's little book, the Wage-Worker's Remedy, is a well-meant, but rather hysterical, attempt to solve the labor question. Although utterly lacking scientific value, it is interesting to most Journal readers, because the author is a Detroit man, and because it reveals how the average mind is groping and floundering in the midst of a forest of contradictions and in swamps of bad logic to the discovery of the truth. We do not claim to know beyond question the right path, but feel sure that Mr. Dowling has hopelessly lost his way.

"In the first place, Mr. Dowling's view is entirely confined to this country. His wage worker is the American

wage worker.    This is mainly why his effort has no value
as a contribution to economic science.    What would be
thought of a writer who tried to explain the law of the
correlation of forces wholly from the American or the
French standpoint?    The truths of political economy are,
of course, world-wide, like all truth.    Rent and interest
and wages must rise and fall in the United States in obe-
dience to the same eternal laws that govern them else-
where.    To think otherwise is to doubt the harmony and
simplicity of God's rule.

· "Bearing this in mind, one of the author's nine remedies
for low wages and lack of employment is seen to be inade-
quate.    For instance, he would suspend immigration to
this country; yet Italy, Germany, and Poland, all having
emigration instead of immigration, and enjoying to a
small degree some of his other remedies, are suffering
from low wages.    Ireland still seems to be too crowded,
although, from famine and emigration, her population has
been reduced one-half in less than a century.    Surely,
France's low wages have not been caused in any way by
immigration, and war and starvation and a low birth rate
have kept her population within reasonable limits, almost
at a standstill.

"Another of Mr. Dowling's remedies for low wages is
government ownership of railroads, street railways, tele-
graph lines and telephones.    This is funny.    He doesn't
stop to think, but disposes of the whole subject almost
with one flourish.    If he had stopped for even a moment,
it might have occurred to him that wages were low before
the telegraph and locomotive were known.    In his hasty
opinion, governmental operation of street cars would real-
ize Mayor Pingree's dream of a three-cent fare, and that
would lead to more travel, and hence to the employment
of more men.    There you are.    The whole question of
labor is solved!    But electricity has displaced horses (out-
side Detroit); travel on street cars has doubled; and yet
wages have fallen.    We, of course, are using the word
'wages' in its strict economic sense, whereas Mr. Dowling
for the moment has in mind only the wages of one set of
men.    The reduction of street-car fares, he says, would
be equivalent to raising the wages of those wage workers
who used the cars.    Has he never thought of the influ-
ence of street-car improvements on rent?    May it not be
possible that the landowner, not the wage earner, would
absorb the benefits of such improvements?    We are not

arguing against the restriction of immigration, and governmental ownership and management of these natural monopolies. They may be desirable in themselves, but as a solution of the labor problem they are ridiculous.

"Mr. Dowling disclaims being a paternalist; yet he advocates the most astounding piece of socialistic policy. He inveighs against class legislation, and then proposes some legislation of that kind. He would have the government forbid a higher rate of interest than 4 per cent. and a lower rate of wages than $2 a day. Such childish suggestions were bad enough in the Middle Ages, when the laws of political economy were unknown. An old king commanded the tide to recede, and an English parliament undertook to fix a maximum wage. Both were excusable, for they were ignorant. We know better to-day. Like the tide, wages follow certain unchangeable laws. The old king might have erected a stone wall against the tide, but the tide would have gone on working just the same, until it overflowed the obstruction or undermined it or pushed it over. So the law of wages does not cease to operate when artificial obstructions are put in the way of its sweep. Something may fall and smash, but it will not be the fault of the economic law. The law itself is all right, being the will of the Creator, and any patchwork by the finite mind cannot but lead to bad results.

"Mr. Dowling simply does not understand what 'wages' are, in the meaning given to the word by political economy. He has constantly in mind the popular meaning of the word as applied to 'wage earners.' In political economy, however, the meaning of the word 'wages' is broader. It is the return for any service or for any productive labor. Thus, many are their own employers, and receive as wages what they themselves produce. How could the legislature compel an express-wagon driver or a small market gardener or a small shopkeeper to pay himself at least $2 a day? The merchant is both a capitalist and a wage earner, as political economy regards him. His profits are made up of interest on his capital, and of wages of superintendence. He may have, let us say, 50 clerks employed, at an average rate of $1.50 a day. The law suddenly compels him, according to Mr. Dowling's scheme, to pay them not less than $2 a day, increasing his expenses $25 a day. He is himself a laborer, a wage worker, as truly as are his clerks, and nine times out of ten a

harder and more anxious worker, for upon him rests responsibility, and the shame should failure come. His own wages may already be cut down fearfully by high rent and competition; yet Mr. Dowling would arbitrarily make him pay higher wages to his clerks than the labor market required. Of course, like all quack remedies, it would intensify the trouble if it had any effect at all. Besides trickery and lying, it would cause business failures and the employment relatively of less clerks. The tide might be dammed up for a moment, but its strength would be felt.

"About one-third of Mr. Dowling's book is devoted to praising Henry George, and to refuting his ideas. In the opening chapter he quotes from George without giving him credit, and outdoes him in raising alarm over present social conditions, even saying that revolution is at hand unless something is quickly done to appease the wrathful and wronged masses. In the last chapter he has apparently cooled off, forgotten his alarm, and believes that material progress tends to benefit all. One wonders what he made a fuss for first, especially when it is found that he believes that some poverty is sure to exist anyway. He says Henry George's scheme is socialistic, and then he proposes an extension of governmental powers which would make Sam Goldwater happy. He denounces the single-tax scheme as robbery, and then advocates it, at least so far as it is applied in New Zealand. He would exempt improvements largely, and tax land values so high as to prevent speculation in land, which is all any single taxer dares to hope will be accomplished in a generation or two to come. After giving his programme of nine remedies, Mr. Dowling thinks of many more. He would prohibit the acquirement of more land by any man than is actually needed by him for business or homestead purposes. This is pretty strong for one who has just been defending the institution of private property in land as all right, and it hasn't the merit of originality, for Horace Greeley advocated the same thing 50 years ago.

"It is altogether an amusing book, as full of contradictions and absurdities as a schoolboy of tricks. Mr. Dowling gravely assures the reader that the remedy for poverty is 'steady work, shorter hours, and fair wages.' He might have added that food is an excellent remedy for hunger.

" ' The Wage-Worker's Remedy ' is on sale at Hunt & Eaton's, 189 Woodward Ave."

The defendants, with their plea, gave notice that they would insist in their defense that they had the right, and that it was their duty, to justly and fairly criticise said book, and that the criticism complained of is a just and fair one, and was published without malice or intention to injure said plaintiff. Two questions are presented: (1) Is the article libelous? (2) If so, what is the measure of damages?

*Cutcheon, Stellwagen & Fleming,* for appellants.

*Morgan E. Dowling, in pro. per.*

GRANT, J. *(after stating the facts).* The propositions advocated by the plaintiff are thus stated in the third chapter of his book:

" 1. The suspension of all immigration to this country.

" 2. The making of eight hours a legal day's work.

" 3. The prohibition of marriage under the age of 21 years.

" 4. The prohibition of the employment of children under 15 years of age in workshops, factories, and mines.

" 5. The fixing of the minimum rate of wages at $2 per day for all laborers, except domestic and farm laborers.

" 6. The reduction of the legal rate of interest to 4 per cent. per annum.

" 7. The purchase of all street railways, and the placing of them under the control and management of the municipal authorities.

" 8. The purchase of all telegraph, telephone, and railroad lines in the United States, and the placing of them under the control and management of the national government.

" 9. The prohibition of the purchase of lands in this country by nonresident aliens, and the compelling of all nonresident aliens who now own lands to sell them within a specified time, or forfeit their titles."

The book is mainly devoted to a discussion and elucidation of these propositions. No malice was shown on the

part of the defendants, unless it is fairly deducible from the article itself. On the contrary, it appears to be conclusively established that the defendants did not entertain any malice towards him, and that the book was placed by them in the hands of their critic, who wrote the article, without any comment or instruction.

When an author places his book before the public, he invites criticism; and, however hostile that criticism may be, and however much damage it may cause him by preventing its sale, the critic is not liable in an action for libel, provided he makes no misstatement of any material facts contained in the writing, and does not attack the character of the author. The book and the criticism are both before the public. The language we used in *Belknap* v. *Ball*, 83 Mich. 589, applies to this case:

"When language is truthfully stated, the criticism thereon, if unjust, will fall harmless, for the former furnishes a ready antidote for the intended poison. Readers can then determine whether the writer has, by the publication, libeled himself or the candidate. When the language is falsely and maliciously stated, privilege ceases to constitute a defense."

We think that case and the authorities there cited establish the principle governing this.

Townshend (Sland. and L. § 258) states the rule as follows:

"As criticism is *opinion*, it can never be *primarily* material to inquire into its justness. The right to criticise implies the right to judge for one's self of the *justness of the criticism*. It would seem to be but a delusion to say one has the right to criticise, *provided* the criticism be just. The justness or unjustness can never be more than matter of opinion. The test always is, was the criticism *bona fide?* It is like the case of one writing concerning the sanity of another. The test of the justification is not, was the statement such as a man of sound sense would have made? but, was it the honest conviction of the publisher?"

The case of *Bacon* v. *Railroad Co.*, 66 Mich. 166, has no application to this case. No question of criticism of an author's writing was there involved. The defendant had reported the plaintiff as having been discharged from its employ for stealing. The report was a direct attack upon his personal character. There is in both reason and authority a wide distinction between language uttered concerning a person and criticism of his writings. Townsh. Sland. & L. § 255.

It was said in *Campbell* v. *Spottiswoode*, 3 Fost. & F. 428:

"The article, no doubt, is pungent, bitter, and caustic. At the same time, public men, and, above all, public writers, must not complain if they are sometimes rather roughly treated. Public writers, who expose themselves to criticism, must not complain that such criticism is sometimes hostile. * * * It was perfectly lawful for a public writer to say that it was an idle scheme, and that it was a delusion to suppose that, by forcing these papers [meaning the plaintiff's newspapers] into circulation by free distribution, the great cause of missions would be promoted, and, in short, to denounce the whole scheme as pernicious and delusive."

In a note to the above case will be found cited several English cases sustaining the rule. See, also, Townsh. Sland. & L. § 254.

It is not libelous to ridicule literary composition. *Carr* v. *Hood*, 1 Camp. 355, note. Lord Ellenborough in that case said:

"One writer, in exposing the follies and errors of another, may make use of ridicule, however poignant. Ridicule is often the fittest weapon that can be employed for such a purpose. If the reputation or pecuniary interests of the person ridiculed suffer, it is *damnum absque injuria*. Where is the liberty of the press if an action can be maintained on such principles? * * * Every man who publishes a book commits himself to the judgment of the public, and anyone may comment on his performance. If the commentator does not step aside from

the work, or introduce fiction for the purpose of condemnation, he exercises a fair and legitimate right."

It is unnecessary to cite or quote further from the authorities. The rule of law in such cases is clear. In applying it to the present case, we find that the personal character and reputation of the author are not attacked. His theories are. In no material matter is there any misstatement of fact or of the propositions set forth in the book. The critic was at liberty to attack or denounce them with sarcasm and ridicule.

The learned circuit judge instructed the jury that "the defendants had the right to ridicule this book if, in the candid judgment of any fair man, the book or any part of it deserved ridicule." This is not the law. As already shown, when the critic correctly states the author, he (the critic) is the sole judge of the language of his criticism. Many fair men might disagree with him, and very likely would in this case. This is for the public, and not for a jury, to determine. If the plaintiff's contention be the correct rule of law, then the protectionist might maintain an action for libel against the free trader who attacks his protection theories and arguments with sarcasm, ridicule, and contempt.

Plaintiff insists that the defendants charged him with plagiarism because he did not give Henry George credit for a quotation from his works. The quotation was inclosed in quotation marks, but not credited to Mr. George, and the court very properly charged the jury that this did not charge him with plagiarism.

The court also correctly instructed the jury that it was not libelous to call his remedy a "quack remedy."

It was not libelous to say that "Horace Greeley advocated the prohibition of the acquirement of more land by a man than is actually needed by him for his business or homestead purposes," even though it should appear that Mr. Greeley had not advocated such a doctrine.

Complaint is also made of the statement that "he [plaintiff] denounces the single-tax scheme as robbery."

In that part of the book to which this statement has reference, plaintiff is discussing the single-tax theory of Mr. George, and is denouncing his proposition to take the land from the present owners without compensation, which he denounces as "a gigantic piece of robbery." As stated in the book, this was a part of the single-tax theory of Mr. George. The article complained of, however, correctly states the position of the plaintiff upon this subject.

The declaration contains no innuendoes, and, although the criticism is undoubtedly severe and caustic, it does not exceed the bounds of legitimate criticism. The court should have directed a verdict for the defendants.

Judgment reversed, and a new trial ordered.

The other Justices concurred.