Drew PEARSON, Appellant,

v.

FAIRBANKS PUBLISHING CO., Inc., and
C. W. Snedden, Appellees.

No. 585.

Supreme Court of Alaska.

April 28, 1966.

Robert A. Parrish and Warren A. Taylor, Fairbanks, for appellant.

Robert J. McNealy of McNealy & Merdes and Henry J. Camarot, Fairbanks, for appellees.

Before DIMOND, Justice, and MOODY and DAVIS, Judges.

DIMOND, Justice.

This is a libel action brought by appellant against appellees. The case was tried by the court without a jury. Judgment was entered in favor of appellees and appellant brought this appeal.

Appellant is a newspaper columnist and author of a widely circulated, syndicated and copyrighted daily column entitled "Washington Merry-Go-Round". Prior to August 1, 1958 appellant's column was published in appellee's newspaper, the Fairbanks Daily News-Miner.

On July 7, 1958 appellant's column dealt with Alaska's effort to achieve statehood.[1] It described the then Governor of Alaska, Mike Stepovich, as a "Johnny-come-lately" to the statehood cause, and attributed the success of the statehood movement to Ernest Gruening.[2] On the following day, July 8, 1958, appellees published an editorial criticising the accuracy of appellant's column. The editorial was entitled "The Garbage Man of the Fourth Estate". It defended Governor Stepovich's position and efforts as an advocate for statehood, stated that one of appellant's colleagues in Washington, D. C. had described appellant as the "Garbage Man of the Fourth Estate", raised the question of why appellee should give space in its newspaper to the printing of garbage, and ended with the comment:

For the time being we'll get a clothespin for our editorial nose while we decide what to do about this free-wheeling garbage man of the fourth estate.

On August 15, 1958 appellee published another editorial entitled "Exit Drew Pearson". This editorial referred again to the alleged comment of a member of the working press in Washington, D. C. to the effect that appellant was "the garbage man of the fourth estate", and stated that appellant's column was being dropped because appellee did not wish to distribute garbage with its newspaper.[3]

The trial court held that the editorials were qualifiedly privileged, that they constituted fair comment, and that they were not made with malice. Appellant claims that the trial court was in error.

█ To refer in appellee's editorial to appellant as a garbage man and to his writings as garbage was to infer that appellant was inaccurate as a journalist, and that his writings were literary trash—that they were worthless. Such publications were defamatory in themselves because they had a natural tendency to injure appellant's reputation and to result in a lack of confidence in his competency as a responsible and accurate newspaper journalist. The language of the editorials was not susceptible of an interpretation that would not have detracted from appellant's reputation.[4]

█ A publication that is defamatory in itself is itself an injury entitling the injured one to recover damages, unless it is shown to the satisfaction of the trier of fact that the defamatory matter is true or that the one who published the defamatory matter

---

1. The Congressional act to provide for admission of the State of Alaska into the Union was approved by the President on July 7, 1958.

2. In November 1958 Ernest Gruening defeated Mike Stepovich in a contest for one of Alaska's two seats in the United States Senate.

3. Appellant's column of July 7 and the editorials of July 8 and August 15, 1958 are printed in full in an appendix to this opinion.

4. Fairbanks Publishing Co. v. Pitka, 376 P.2d 190, 194 (Alaska 1962).

was privileged to publish it.[5] The trial court found that the defamatory matter contained in appellee's editorials was false. The accuracy of such finding is not questioned by appellee. We accept it. The remaining question, then, is whether appellee was privileged to publish the false and defamatory matter that appeared in the two editorials.

In Fairbanks Publishing Co. v. Francisco [6] we stated:

> The law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks. But there is a well established counter policy that in certain situations there is a paramount public interest permitting persons to speak or write freely without being restrained by the possibility of a defamation action. In such situations the person writing or speaking is said to enjoy a privilege.

■■ A privilege exists here. The subject of Alaska Statehood was of public interest and concern. When, in speaking out on that subject, appellant belittled the efforts toward achieving statehood of the then governor, Mike Stepovich, and praised the efforts of a former governor and then Territorial Plan Senator,[7] Ernest Gruening, both being men of prominence in Alaska, appellant invited public judgment, comment and criticism of the stand he took. As to how far such judgment, comment and criticism should go involves a balancing of interests. On the one hand there is the interest in safeguarding the right to one's reputation. On the other hand there is the interest in allowing freedom of debate and expression on public questions and issues. We believe that a fair balance of these competing interests is achieved where the law of defamation permits one, without liability for damages, to comment, criticize and pass judgment on statements made by another on an issue or matter of public interest, even if such comment, criticism and judgment involves misstatements of fact—so long as such misstatements are relevant to the subject matter spoken or written about by the one claiming to be defamed and are not shown by him to have been made with actual malice.

The rule which we adopt here is a logical extension of the rule which accords a privilege to one who passes judgment and comments on those things which are submitted to the public for its approval, such as books, articles, advertisements, works of art, and others.[8] The situation here is not dissimilar. Appellant purported to give facts to the public on a matter of public concern and interest. He was attempting to influence public opinion; he was seeking to have the public accept as true or to approve of his views on the subject about which he wrote. He should be in no position to complain if the judgment, opinion, comment or criticism is adverse.[9]

We are aware of the fact that where matters of public concern are involved the majority of the courts hold that the privilege of public discussion does not extend to misstatements of fact but is limited to opinion, comment or criticism based upon a

---

5. Restatement, Torts § 569 (1938).

6. 390 P.2d 784, 793 (Alaska 1964).

7. Ordinance No. 2 of the State Constitution, agreed upon by the constitutional delegates on February 5, 1956, provided for what was called the "Alaska-Tennessee Plan." Under that plan two United States Senators and one United States Representative were to be chosen at the 1956 general election for the purpose of promoting the cause of statehood for Alaska.

8. Potts v. Dies, 77 U.S.App.D.C. 92, 132 F.2d 734, 735 (1942), cert. denied, 319

U.S. 762, 63 S.Ct. 1316, 87 L.Ed. 1713 (1943) (Article); Willis v. O'Connell, 231 F. 1004, 1016–1017 (S.D.Ala.1916) (Advertisement); Dowling v. Livingstone, 108 Mich. 321, 66 N.W. 225, 227–228, 32 L.R.A. 104 (1896) (Book); Outcault v. New York Herald Co., 117 App.Div. 534, 102 N.Y.S. 685, 686–687 (1907) (Art Work); 1 Harper & James, Torts § 5.28, at 457–58 (1956); Prosser, Torts § 95, at 621 (2d ed. 1955); Restatement, Torts § 609 (1938).

9. Prosser, Torts § 95, at 621 (2d ed. 1955).

true statement of fact.[10] We do not follow the majority rule, but hold that the privilege extends to non-malicious misstatements of fact.[11] The distinction between a fact statement and an opinion or comment is so tenuous in most instances, that any attempt to distinguish between the two will lead to needless confusion.[12] The basis for the privilege is that it is in the public interest that there be reasonable freedom of debate and discussion on public issues. One should not be deterred from speaking out through the fear that what he gives as his opinion will be construed by a court as inferring, if not actually amounting to, a misstatement of fact.

Appellees ask us to construe the United States Supreme Court's decision in New York Times Co. v. Sullivan [13] as extending to appellees a defense to this action for defamation brought by appellant. In the *Sullivan* case the Court held that the first amendment to the federal constitution requires a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct, unless he proves that the statement was made with "actual malice"— that is, with knowledge that it was false or with reckless disregard of whether it was false or not.[14] In view of the result that we have reached here—that appellees are not liable to appellant in the absence of a showing of actual malice—it is unnecessary for us to speculate as to whether the United States Supreme Court would extend the protection of the first amendment so as to encompass situations other than those which involve defamatory falsehoods relating to the official conduct of public officials.[15]

10. Prosser, Torts § 95, at 621–22 (2d ed. 1955); Berney, Libel and the First Amendment—A New Constitutional Privilege, 51 Va.L.Rev. 1, 9 (1965). Restatement, Torts § 606 (1938) follows the majority rule.

11. Snively v. Record Pub. Co., 185 Cal. 565, 198 P. 1, 5 (1921); Salinger v. Cowles, 195 Iowa 873, 191 N.W. 167, 173–174 (1922); Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 291–292, 20 L.R.A., N.S., 361 (1908); Clancy v. Daily News Corp., 202 Minn. 1, 277 N.W. 264, 268 (1938).

12. Berney, Libel and the First Amendment—A New Constitutional Privilege, supra note 10. See 1 Harper & James, Torts § 5.28, at 458 (1956).

13. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

14. New York Times Co. v. Sullivan, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686, 706–707 (1964).

15. For cases which have discussed application of the Sullivan rule see: Pauling v. News Syndicate Co., 335 F.2d 659 (2d Cir. 1964), cert. denied, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1965); Walker v. Savell, 335 F.2d 536, 544 (5th Cir. 1964); Clark v. Pearson, 248 F.Supp. 188 (D.D.C. December 20, 1965); Fignole v. Curtis Publishing Co., 247 F.Supp.

595, 597–598 (S.D.N.Y.1965); Walker v. Courier-Journal, 246 F.Supp. 231, 232–234 (W.D.Ky.1965); H. O. Merren & Co. v. A. H. Belo Corp., 228 F.Supp. 515, 519 (N.D.Tex.1964), aff'd, 346 F.2d 568 (5th Cir. 1965); Tucker v. Kilgore, 388 S.W.2d 112, 116 (Ky.Ct.App.1965); Baer v. Rosenblatt, 106 N.H. 26, 203 A.2d 773, 779–780 (1964), rev'd, 86 S.Ct. 669 (Feb. 21, 1966); State v. Browne, 86 N.J.Super. 217, 206 A.2d 591, 598–599 (1965); Nusbaum v. Newark Morning Ledger Co., 86 N.J.Super. 132, 206 A.2d 185, 197–199 (1965); Gilligan v. King, 48 Misc.2d 212, 264 N.Y.S.2d 309, 312–314 (Sup.Ct.1965); Faulk v. Aware, Inc., 14 N.Y.2d 954, 253 N.Y.S.2d 990, 202 N.E.2d 372 (1964), cert. denied, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965); Dempsey v. Time, Inc., 43 Misc.2d 754, 252 N.Y.S.2d 186, 188–189 (Sup.Ct.), aff'd, 22 A.D.2d 854, 254 N.Y.S.2d 80 (Sup.Ct.1964); Gilberg v. Goffi, 21 A.D.2d 517, 251 N.Y.S.2d 823, 824–825 (1964), aff'd, 15 N.Y.2d 1023, 260 N.Y.S.2d 29, 207 N.E.2d 620 (1965); Spahn v. Julian Messner, Inc., 43 Misc.2d 219, 250 N.Y.S.2d 529, 535 (Sup.Ct.1964), aff'd, 23 A.D.2d 216, 260 N.Y.S.2d 451 (1965); Clark v. Allen, 415 Pa. 484, 204 A.2d 42, 44–46 (1964). For a discussion of some of the foregoing cases, see Note, New York Times Co. v. Sullivan—The Scope of a Privilege, 51 Va.L.Rev. 106, 109–17 (1965).

"Actual malice" must be defined. In Fairbanks Publishing Co. v. Francisco [16] we said with reference to the earlier case of Fairbanks Publishing Co. v. Pitka [17] that we had "defined actual malice as 'ill will, enmity, hatred, spite or desire to injure the plaintiff in her fame, reputation or profession or to degrade, ridicule or disgrace her.'" The fact of the matter is that we had not defined "actual malice" in the sense of formulating a meaning of the term for future cases, but had merely accepted the definition of "actual malice" as given by the trial court in its instruction to the jury for the purpose of our determination in the *Pitka* case as to whether there had been any evidence of actual malice.

We believe that it is not conducive to desirable outspokenness in debate and discussion upon public questions and issues to hold that the privilege of non-liability in a defamation action is conditioned upon the speaker or publisher who claims the privilege being free from subjective motives of ill will, enmity, hatred, spite or desire to injure. As the United States Supreme Court said in Garrison v. State of Louisiana: [18]

> Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.

We adopt for this jurisdiction the meaning of "actual malice" as given by the United States Supreme Court in the case of New York Times Co. v. Sullivan.[19] Actual malice exists when it is proved that the defamatory statement was made with knowledge that it was false or with a reckless disregard of whether it was false or not. Under this meaning of the term, the use of the knowingly false statement or the false statement made with reckless disregard of the truth will abuse—thus destroying—the privilege that otherwise would be enjoyed in discussion and debate on public questions and issues.[20]

The trial court found that there was no actual malice. We are obliged to sustain such finding unless it is shown to be clearly erroneous.[21] We perceive no clear error. In referring to appellant as a "garbage man" and to his writings as "garbage", the imputation was that appellant was inaccurate and that his writings were worthless, that they were literary trash. There was evidence which, if believed by the trial judge, would show that the appellee, Snedden, who caused the editorials of which appellant complains to be published, believed and had a reasonable basis for believing that appellant's writings frequently did not conform with facts and were therefore worthless. The evidence justifies a finding that appellee's characterization of appellant as a garbage man and of his writings as garbage was not made with knowledge that it was false or with a reckless disregard of whether it was false or not.

Appellant's final point is that he was deprived of a fair trial by reason of the fact that the trial court interfered and allowed appellee's counsel to interfere with

16. 390 P.2d 784, 797 (Alaska 1964).

17. 376 P.2d 190, 195 (Alaska 1962).

18. 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125, 132 (1964).

19. 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686, 706 (1964).

20. See Garrison v. State of Louisiana, supra note 18, 379 U.S. at 75, 85 S.Ct. at 216, 13 L.Ed.2d at 133.

21. Civ.R. 52(a) provides in part that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."
See, e. g., Williams v. DeLay, 395 P.2d 839, 845 (Alaska 1964); First Nat'l Bank of Fairbanks v. Dual, 392 P.2d 463, 465 (Alaska 1964); Isaacs v. Hickey, 391 P.2d 449, 451 (Alaska 1964); Nordin v. Zimmer, 373 P.2d 738, 741–742 (Alaska 1962).

the cross-examination of the appellee, Snedden. From a review of the record we find this point to be without merit.

The judgment is affirmed.

## APPENDIX

The following column appeared in the Fairbanks Daily News-Miner—Monday, July 7, 1958:

Drew Pearson's WASHINGTON Merry-go-round. . . . .

WASHINGTON—A lot of Johnny-come-latelies such as Gov. Mike Stepovich are now claiming credit for making Alaska the 49th state in the Union. But the man who unobtrusively, but consistently, badgered senators, buttonholed congressmen, maneuvered in the smoke-filled rooms to bring statehood to Alaska is an ex-newspaperman named Ernest Gruening. He more than anyone else is the father of the 49th state.

Gruening first came to Washington in 1933 as chief of insular affairs division of the Interior Department organized under the late great Harold Ickes. As such, he guided the destinies of such American stepchildren as the Virgin Islands, Puerto Rico, Hawaii and Alaska.

Gruening had taken a degree at Harvard Medical School, but spent much of his time as a newspaperman, and was editing the Portland, Maine, Evening Express when he came to Washington to nurse American territories. After battling their causes before Congress, he was made governor of Alaska in 1939, and as such did a revolutionary thing.

He went all over that far flung territory, visiting every Eskimo village, every island in the Aleutians, every backwoods settlement, getting to know the people and their problems. By a rickety plane, and even by canoe, he toured the northwest territory.

Back in Washington when Congress was in session, he called on congressmen to plead for Alaskan problems. For 14 years, longer than any other man in history, he remained the governor of Alaska. Then when Eisenhower failed to reappoint him in 1953, the people of Alaska elected him unofficial senator and he moved to Washington to undertake a 24-hour-a-day lobbying campaign for the Territory's statehood.

Shortly before this, however, a great tragedy struck Ernest Gruening's family which, though it brought grief to him, probably hastened the day when Alaska became the 49th state.

His son, Peter, a correspondent for the United Press, was killed in Australia, and his grief-stricken father more than ever threw all his heart and soul into the battle for Alaskan statehood. In effect he made Alaska his child.

That is the real story of the No. 1 lobbyist for Alaska and how statehood was achieved.

In some respects the state of Texas probably had most to lose by admission of Alaska as the 49th state. But Sen. Lyndon Johnson put national interest ahead of state interest and worked quietly behind the scenes for Alaska. Without his potent support the bill would have been delayed.

Alaska, with 587,000 square miles against Texas' 267,000, now becomes the biggest state in the Union. California can no longer boast the highest peak in the U. S. A., for Mt. McKinley in Alaska is 6000 feet higher than Mt. Whitney in California. And Yellowstone is no longer the biggest national park. McKinley National Park is the biggest.

Finally, a new crop of Texas jokes will have to be told.

The following editorial appeared in the Fairbanks Daily News-Miner—Tuesday, July 8, 1958:

## GARBAGE MAN OF THE FOURTH ESTATE

Drew Pearson irritates us often. On days like yesterday he infuriates us. It isn't so much because of his opinions, which frequently are so biased they almost tilt out of the page, as it is because his facts are so cockeyed.

In yesterday's Washington-Merry-Go-Round column printed on the News-Miner's editorial page, Mr. Pearson credited Ernest Gruening with being "more than any one else the father of the 49th state." This is a matter of opinion. We think Drew Pearson is not in the best of all possible positions to draw such a conclusion. Without wishing in the least to deprecate the fine contribution of former governor Gruening, we feel that the columnist is somewhat off the beam there. That, of course, is our opinion.

But in describing the statehood efforts of our former governor—real and imaginary—we think it was wholly unnecessary for Mr. Pearson to start his piece by describing our present governor as a "Johnny-come-lately" and stating that Governor Stepovich is "now claiming credit for making Alaska the 49th state."

Mike Stepovich, born in Fairbanks, can hardly be described accurately as a Johnny-come-lately. He has too much of an understanding of the cooperative endeavor which the gaining of statehood was, and · too much to do, to be claiming credit for that accomplishment. To the best of our knowledge, Mike Stepovich hasn't been claiming a thing.

No one can dispute that Ernest Gruening, over a long period of years, was dedicated to the statehood cause. It is true he threw himself heart and soul into the battle. In fact, he threw himself in on many occasions when it would have served the cause of statehood vastly better for him to have kept himself out.

We are reminded here of a description given by one who is as familiar with the Washington scene as Drew Pearson—and immensely more familiar with the details of the Alaska statehood struggle there. This man said, "It's a good thing the people of Alaska sent down two other Tennessee Plan representatives, and had Bob Bartlett on the job, because it has taken practically the full time efforts of three men for the past two years patching up the damage Gruening did."

One word in Mr. Pearson's column about Ernest Gruening sticks out like a sore thumb. The word says he worked "unobtrusively" in Washington. It sticks out because it is so devastatingly inappropriate. If you ever see anybody being unobtrusive, you won't have to ask his name to be sure it is not Ernest Gruening.

It is too bad that Drew Pearson was stimulated to write the things he did about our former governor and our present one, because they are going to hurt Mr. Gruening in Washington and in Alaska, where he is all too well known.

Yesterday's column deepens a doubt we already had in our mind about the usefulness of Drew Pearson on the national scene. Almost every single thing he ever said about Alaska has been inaccurate either in whole or in detail. Long before yesterday this raised for us the question of whether he is as irresponsible in all fields and on all subjects as he is in respect to Alaska. If he is, he is doing a distinct disservice to the American republic, which being a democracy can only function wisely to the extent its citizens are well and fairly informed by the press.

Does Mr. Pearson so inform his readers? Not on matters Alaskan, of our certain knowledge; and not on much of anything else, in the opinion of his Washington colleagues, one of whom the other day described him as "the garbage man of the fourth estate."

This would seem to raise the point—which frankly has bothered us from time to time in the past—of why we should give space in our newspaper to the printing of garbage. We have worried about that. Even though the Washington Merry-Go-Round is the most popular and widely read column sent out from Washington, the question worries us right now.

For the time being we'll get a clothespin for our editorial nose while we decide what to do about this free-wheeling garbage man of the fourth estate.

The following editorial appeared in the Fairbanks Daily News-Miner—Friday, August 15, 1958:

## EXIT DREW PEARSON

For some years the News-Miner has carried the Washington column by Drew Pearson called "Washington Merry-Go-Round". Since Aug. 1 it has not appeared in our paper and several subscribers have telephoned or written to ask what happened to Pearson.

The Pearson column has been discontinued. . This was not an action which we took lightly or without a good deal of thought, as the "Washington Merry-Go-Round" is undeniably a popular feature in many newspapers.

We have known for a long time that on subjects having to do with Alaska Mr. Pearson has been so inaccurate as to be very disturbing to us. It was not until the publisher of the News-Miner recently spent several months in Washington, however, that the general reputation of this columnist was fully appreciated.

That reputation is summed up in the comment of a member of the working press in the nation's capital that Pearson is "the garbage man of the fourth estate."

Not wishing to distribute garbage with our newspaper, we have dropped Pearson. We will not be parties to publishing what we know to be inaccurate and misleading.

Since the early part of this year, while our publisher and other Alaskans have been in Washington in connection with the statehood bill, they have observed at first hand some of the happenings on which Drew Pearson commented in his column. We do not mean things connected with statehood, but other events in Washington. We are sorry to have to say that, in our opinion, Pearson's accounts were not very closely related to the real events.

It is not because Mr. Pearson is allegedly "liberal" or "anti-Republican" that we are dropping him. It is just because he is so everlastingly careless with the facts.

Another Washington column, whose writer deals accurately with the great problems of the day in our nation, will soon start in the News-Miner.