Jake OLIVIT, Sr., Appellant,

v.

CITY AND BOROUGH OF JUNEAU;
John Hartle; The Juneau Empire;
and Tony Carroll, Appellees.

No. S–12216.

Supreme Court of Alaska.

Nov. 23, 2007.

Jake D. Olivit, Sr., pro se, Juneau.

Eric A. Kueffner, Faulkner Banfield, P.C., Juneau, for Appellees City and Borough of Juneau and John Hartle.

L. Merrill Lowden, Simpson, Tillinghast, & Sorensen, Juneau, for Appellees Juneau Empire and Tony Carroll.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

In 2004 the Juneau Empire published an article with this headline: "City faces fifth lawsuit by man who claims harassment." The article was largely about Jake Olivit, Sr. Six months later Olivit sued the Empire, reporter Tony Carroll, the City and Borough

of Juneau, and city attorney John Hartle. Olivit's complaint, which implied that the City and Borough of Juneau and Hartle had arranged for the article's publication to retaliate against him, included claims for defamation, invasion of privacy, and intentional infliction of emotional distress. The superior court dismissed all of his claims. Olivit appeals, asserting among other things that his claims should not have been dismissed, that default should have been entered against the Empire, and that the defendants should not have been awarded attorney's fees. We affirm. It was not error to dismiss his claims. The article's statements either were not defamatory or were privileged because they concerned matters of public importance. Olivit was not eligible for a default judgment because the Empire filed its answer to Olivit's complaint before Olivit sought a default. We also conclude that the court did not abuse its discretion in awarding the defendants twenty percent of their attorney's fees as the prevailing parties.

## II. FACTS AND PROCEEDINGS

### A. Factual History

This case arises out of a December 3, 2004 Juneau Empire newspaper article about a lawsuit Jake Olivit, Sr., filed on December 1, 2004 against the Juneau Police Department (JPD) and JPD Officer Paul Comolli. Olivit alleged in that lawsuit, Case No. 1JU–04–907 CI, that the JPD had engaged in a pattern of harassment against him. Part of Olivit's claim in that case was that Officer Comolli had dropped a set of JPD keys on Olivit's property while carrying out a late-night harassing visit to Olivit's home. In the present case Olivit asserts that someone claiming to be city attorney John Hartle called Olivit on December 2, the day after Olivit filed suit against Officer Comolli and the JPD, and threatened to discredit Olivit on the front page of the Juneau Empire if Olivit did not

return the JPD keys in his possession. On the following day, December 3, the Empire printed a story written by reporter Tony Carroll describing Olivit's suit against Officer Comolli and other suits Olivit had brought against the City and Borough of Juneau. The present lawsuit arises out of this December 3 article.

### B. Procedural History

Olivit filed his complaint in this case against the City and Borough of Juneau and John Hartle and the Juneau Empire and Tony Carroll.[1] He alleged in it that statements in the December 3 article are untrue and were written to "discredit and attack" him and his family. His complaint claimed "[d]efamation of [c]haracter with actual malice, invasion of privacy (false light) with actual negligence, discrimination, [and] civil rights violation of the First Amendment to the Constitution." His initial complaint also named Gloria Olivit, Olivit's wife, as a plaintiff.

The CBJ moved for dismissal for failure to state a claim under Alaska Civil Rule 8(a).[2] The CBJ supported this motion with an affidavit from John Hartle. Relying on Hartle's affidavit, the superior court treated the CBJ's motion as one for summary judgment, but held it in abeyance for thirty days because Olivit was proceeding pro se. Noting the leniency extended to pro se litigants in Alaska, the court's order explained Rule 8's pleading rules and ordered Olivit to file a complaint that satisfied Rule 8 within ten days. The court also ruled that Olivit could not represent his wife and that she must either represent herself or find outside counsel.

On August 29 Olivit moved to dismiss Gloria Olivit as a plaintiff and simultaneously filed an unsworn response that did not address the court's Rule 8 concerns.[3] The CBJ then moved for summary judgment, arguing

---

1. Unless context requires greater specificity, we refer collectively to the City and Borough of Juneau and Hartle as "the CBJ" or "the CBJ defendants," and to the Juneau Empire and Carroll as "the Empire."

2. Alaska Civil Rule 8 explains the general rules of pleading and requires a plaintiff to set forth

claims for which he is entitled to relief against each named defendant.

3. Olivit's appeal does not contend that he should have been allowed to represent Gloria Olivit or that she should have been allowed to proceed as a plaintiff. Jake Olivit, Sr., is the only appellant.

that Olivit had failed to satisfy Rule 8, and the Empire, joined by the CBJ, moved under Alaska Civil Rule 56(b) for summary judgment dismissing Olivit's complaint "for failure to state a claim for which relief may be granted."[4] On October 14 Olivit responded to the defendants' motions. The CBJ replied, noting that Olivit had still failed to state a claim. The court granted the defendants' summary judgment motions and dismissed Olivit's pleadings for failure to state a claim. Olivit appeals.

## III. DISCUSSION

### A. Standard of Review

■ We review a grant of summary judgment de novo.[5] It will be affirmed if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.[6] On review, all reasonable inferences of fact are drawn in favor of the party against whom judgment was entered.[7] "The moving party has the initial burden of offering admissible evidence showing both the absence of any genuine dispute of fact and the legal right to a judgment."[8] Once that burden is satisfied, the non-moving party, to avoid summary judgment, must produce "admissible evidence reasonably tending to dispute or contradict the movant's evidence."[9] The non-moving party may not, however, "rest upon mere allegations, but must set forth specific facts showing that there is a genuine issue of material fact."[10] In addition, "[t]o create a

genuine issue of material fact there must be more than a scintilla of contrary evidence."[11] The evidence in support of, or in opposition to, summary judgment must be admissible under the Alaska Rules of Evidence.[12]

■ We review for abuse of discretion the superior court's determination of which party is the prevailing party for purposes of awarding attorney's fees.[13]

### B. Olivit Fails To Make Out a Claim for Defamation Against the Empire and CBJ Defendants.

#### 1. Defamation, the public interest privilege, and Olivit's claims

Olivit contends that because there were genuine factual disputes, it was error to dismiss his defamation claims against the Empire.

■ To make out a claim for defamation, "a plaintiff has to establish (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either 'per se' actionability or special harm."[14] "A communication is defamatory if it tends to harm the reputation of another so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her."[15]

---

4. The Empire's motion sought summary judgment dismissing Olivit's action "for failure to state a claim for which relief may be granted." This is the standard for dismissal under Alaska Civil Rule 12(b)(6). Because the superior court granted summary judgment against Olivit, we apply our usual standard for reviewing a grant of summary judgment. See Part III.A.

5. *Alaska Action Ctr., Inc. v. Municipality of Anchorage,* 84 P.3d 989, 991 (Alaska 2004).

6. *Norville v. Carr–Gottstein Foods, Co.,* 84 P.3d. 996, 1000 n. 1 (Alaska 2004).

7. *Crawford v. Kemp,* 139 P.3d 1249, 1253 (Alaska 2006).

8. *Cikan v. ARCO Alaska, Inc.,* 125 P.3d 335, 339 (Alaska 2005).

9. *Id.* (citation omitted).

10. *Id.* (citation omitted).

11. *Id.* (citation omitted).

12. Alaska R. Civ. P. 56(e); *Murat v. F/V Shelikof Strait,* 793 P.2d 69, 74–75 (Alaska 1990).

13. *Meidinger v. Koniag, Inc.,* 31 P.3d 77, 88 (Alaska 2001).

14. *French v. Jadon, Inc.,* 911 P.2d 20, 32 (Alaska 1996). *See also* RESTATEMENT (SECOND) OF TORTS § 558 (1977).

15. *Briggs v. Newton,* 984 P.2d 1113, 1120–21 (Alaska 1999) (citation and punctuation omitted). *See also* RESTATEMENT (SECOND) OF TORTS § 559 (1977).

■ Under the Alaska Constitution, a defamatory statement may be conditionally privileged if it concerns a matter of public interest. We have stated that "there is a paramount public interest permitting persons to speak or write freely without being restrained by the possibility of a defamation action." [16] Therefore, "speech on matters of public safety is privileged, but ... this privilege is conditional and can be lost if the plaintiff proves that the speaker uttered untruths with actual malice." [17] Unlike the majority of courts, we follow the rule that "the privilege [of public discussion] extends to non-malicious misstatements of fact." [18]

■ Thus, to make out a claim for defamation based on speech about a matter of public interest, a plaintiff must show that the false and defamatory statements were made with actual malice.[19] "Actual malice exists when it is proved that the defamatory statement was made with knowledge that it was false or with a reckless disregard of whether it was false or not." [20] We have applied this standard to both publishers [21] and government speakers.[22]

Olivit asserts that three passages in the Empire's story defamed him and are actionable: one regarding his "history with the city," another about an incident at the middle school involving his children, and another regarding his plea of guilty to a misdemeanor.

■ **History with the city.** The article quotes Hartle as saying that the city was looking into Olivit's accusations but that it was "skeptical, based on [Olivit's] history with the city." We assume Olivit is alluding,

at least in part, to this statement when he notes on appeal that the article states "that I had a violent criminal history with the city." In his initial verified complaint, Olivit stated that he "maintains no *history* with the City of Juneau." (Emphasis in original.)

■ **Olivit's children.** Olivit states that his "children are not criminals as stated in [the] article." Olivit is apparently referring to the article's statement that Olivit's previous suit against the city "grew out of an April 26 incident at Floyd Dryden Middle School involving Olivit's two sons, the older one taking money for the younger one, a student there." In his verified complaint in the case now before us, Olivit stated that "[t]he Olivit children were not involved with any criminal activities." In his sworn response to the CBJ's motion for summary judgment, Olivit stated that in fact his "son was attacked by a school administrator while engaged in running an errand for his mother by delivery [of] money to his younger brother who attended Floyd Dryden."

■ **Misdemeanor guilty plea.** The article states that Olivit pleaded guilty to misdemeanor assault following the incident at Floyd Dryden Middle School.[23] The Empire admits on appeal that this is incorrect because Olivit entered a guilty plea to misdemeanor disorderly conduct rather than assault.[24] Olivit might be referring to this error when he objects to what he describes as the article's statement that he "had a violent criminal history with the city." Because Olivit stated in his verified complaint that he "never pled guilty to misdemeanor assault," [25] we assume that Olivit is arguing

16. *Fairbanks Pub. Co. v. Francisco,* 390 P.2d 784, 793 (Alaska 1964).

17. *Taranto v. N. Slope Borough,* 992 P.2d 1111, 1115 (Alaska 1999).

18. *Pearson v. Fairbanks Pub. Co.,* 413 P.2d 711, 714 (Alaska 1966).

19. *Id.*

20. *Id.* at 715.

21. *See Pearson,* 413 P.2d at 714; *Francisco,* 390 P.2d at 793.

22. *See Taranto,* 992 P.2d at 1115.

23. Regarding the incident at Floyd Dryden Middle School, the article states that "Olivit said that after he complained to police about it, he was arrested.... Olivit later pleaded guilty to misdemeanor assault in an agreement that imposed one year on probation without any jail time or fine."

24. The criminal judgment states, "[t]he defendant was found and adjudged: GUILTY OF: Disorderly Conduct—Challenge To Fight/Fight."

25. Olivit also asserted in his verified complaint that "[l]awsuits filed in Federal Court were not dismissed in the fashion printed." The article attributes to Hartle the statement that "[o]ther

that he was defamed by the article's misde-scription of the misdemeanor to which he pleaded guilty.

The article about Olivit generally concerns matters of public interest. A claim that the JPD was harassing members of the public, as Olivit asserted in his lawsuit against Officer Comolli and the JPD, is a matter of public interest because it raises questions about the propriety of official or ostensibly official conduct of JPD officers. Furthermore, Olivit's repeated lawsuits adversely affected the city, especially fiscally, and the financial effect of defense costs is a matter of public interest. And the city attorney's description of lawsuits against the city and his description of the plaintiff in those suits is a matter of public interest. Events at a local middle school that lead to criminal charges and a civil lawsuit are also matters of public interest, as are criminal charges and guilty pleas relating to local events. Therefore, each of the article's three challenged statements is conditionally privileged and not actionable unless it was false and defamatory and uttered with actual malice.[26]

### 2. Defamation claims against Tony Carroll and the Juneau Empire

■ We therefore consider whether there is a potential factual dispute about whether Carroll and the Empire acted with actual malice. Although Olivit asserts that the Empire profited from publishing the allegedly defamatory article, he does not explain how. And even if the Empire did profit, that is not evidence that permissibly implies that the article was published with actual malice. In his verified complaint, Olivit stated that "the fact that Tony Carroll and the Juneau Empire failed to confirm anything stated as fact was pure negligence and compounds the malicious act because they were used by the City and its representatives." In his verified response to the CBJ's request for summary judgment, Olivit stated that "we can only guess the motivation behind

Tony Carroll's actions, they were negligent to say the least."

Olivit frequently used the word "malicious" below and uses the same word in his appellant's brief, but he produced no evidence that Carroll or the Empire acted maliciously. Carroll swore in his affidavit that he believed everything in the article to be true. Carroll also explained in his affidavit that he relied on Alaska Court System records and interviews with four city officials, including Hartle, in writing the article, and that he unsuccessfully attempted to contact Olivit. No evidence rebuts any of these assertions. The record contains no evidence permitting an inference that Carroll knew or should have known before publication that any statement in the article was untrue. We therefore hold that Olivit has not demonstrated that there is a genuine factual dispute about whether Carroll and the Empire acted with actual malice as to the article generally or as to the three passages Olivit discusses on appeal.

Olivit seems to assert on appeal that Hartle conspired with Carroll to publish false information about Olivit, but he has pointed to no evidence permitting a reasonable inference of any such conspiracy. We therefore affirm the summary judgment entered in favor of Carroll and the Empire.

### 3. Defamation claims against Hartle and the CBJ

Olivit argues that it was error to dismiss the defamation claim against Hartle and the CBJ. He contends that the CBJ defendants deliberately made false statements about Olivit to interfere with Olivit's pending suit against the city and to cause him economic loss. Olivit made a similar claim in his initial verified complaint, where he seemed to imply that Hartle was retaliating against him because Olivit refused, in response to Hartle's demands and threats, to return JPD keys to the city. He claims that Hartle and the CBJ acted with actual malice.

---

suits Olivit has filed have gone to federal court and have been dismissed." Olivit does not mention this discussion of federal suits in his brief to this court. We therefore deem any possible claim concerning them waived.

**26.** *Pearson,* 413 P.2d at 714.

We choose to take a different analytical approach in considering whether, as Olivit contends, it was error to dismiss the defamation claims against the CBJ and Hartle. Instead of focusing on the malice issue, we consider whether the challenged statements were false and defamatory as to Olivit and whether Hartle was the source of the published information.

■ **Olivit's history.** In reference to Olivit's suit against Officer Comolli and the JPD, the article quotes Hartle as saying "[w]e are looking into it, but we're skeptical, based on [Olivit's] history with the city." Olivit reads the statement as implying he has a violent criminal history with the city. The context of the article strongly implies that Hartle was referring to Olivit's history of suing the city, not to any criminal history. The headline of the article was "City faces fifth lawsuit by man who claims harassment," and Hartle's expression of his skepticism was made in the context of whether Olivit's harassment claims in this, his fifth lawsuit, might be legitimate. Olivit does in fact have a history of bringing suits against the city, so the quoted statement is essentially true and is not defamatory. The statement cannot plausibly be read as implying that the cause of Hartle's expressed skepticism was any "violent criminal" history Olivit might have had with the city.

■ **Olivit's children.** Olivit also seems to imply that Hartle provided Carroll with false information regarding the incident with Olivit's children at Floyd Dryden Middle School. Olivit states that the article defamed his "family name," and that the defamation "was a malicious act perpetrated by John Hartle and Tony Carroll." His brief declares, "[m]y children are not criminals as stated in [the] article." He thus seems to imply that Hartle was the source of allegedly false information about his children. In a verified pleading he filed in superior court,

Olivit stated that "John Hartle was well aware Mr. Olivit's children were not involved in criminal activities at Floyd Dryden Middle School."

We doubt that the passage is defamatory. The article's statement that "the older one [took] money for the younger one" does not state or necessarily imply that the older boy was stealing. By Olivit's own account, his older son was delivering money to the younger one. That is the most plausible way to read the article's words. The article does not suggest that the act of "taking" the money caused the older boy to be subject to discipline or treated as a juvenile offender or that either boy did anything wrong. The focus of the article was on Olivit's own conduct and the criminal consequences to him.

In any event, the reference to his children did not defame Olivit himself.[27] Olivit himself does not have a defamation claim based on any alleged defamation of his children,[28] and he has not attempted to assert a defamation claim on their behalf.

■ **Misdemeanor plea.** Olivit seems to base his defamation claim against Hartle and the CBJ relating to the article's discussion of the guilty plea on his theory that Hartle intentionally gave erroneous information about the plea to Carroll, who then published it. Olivit stated in his verified response to Hartle and the CBJ's summary judgment motions that Hartle "knew beyond any doubt Mr. Olivit did not plead guilty to misdemeanor assault." Olivit's statement in his verified response does not say, but may imply, that Olivit believes Hartle colluded with Carroll to publish false information regarding Olivit's misdemeanor charge, or at least intentionally gave Carroll erroneous information about the plea.

But Carroll swore in an affidavit that he believed he "utilized the Alaska Court System records system to learn of the 2002 criminal misdemeanor case . . . in which Mr.

---

**27.** W. Page Keeton et al, Prosser and Keeton on Torts § 111, at 778 (5th ed.1984); *see also* James D. Ghiardi & John J. Kircher, Punitive Damages: Law and Practice § 13:02, at 13–6 (2d ed.2006) (noting that "[a]s a general rule, only the person who is defamed may maintain an action for defamation").

**28.** *Wilson v. Retail Credit Co.,* 325 F.Supp. 460, 463 (S.D.Miss.1971) (holding that plaintiff did not have defamation claim against mercantile agency for reporting that plaintiff's wife was neurotic, in part because claim was personal to wife herself).

Olivit pleaded guilty to a misdemeanor." Olivit does not rebut Carroll's sworn statement or assert that Hartle was the source of the erroneous information; he merely asserts that Hartle knew the information was false. Olivit's statement is consistent with Carroll's assertion that his information came from the public record, which lists the crime charged as "Assault—Physical Menace." Moreover, Hartle stated in his affidavit that he "made the statements attributed to [him] in the article." The article did not attribute to Hartle any information about the misdemeanor plea.

Olivit's evidence was insufficient to rebut Carroll's affidavit and preserve a genuine factual dispute material to his defamation claim against Hartle based on the misdemeanor plea passage. Absent any evidence permitting a reasonable inference that Hartle was a source of the incorrect information published about the guilty plea, the article's discussion of the plea cannot be the basis of a defamation claim against Hartle and the CBJ.

In short, even assuming Olivit's sworn pleadings are true, none of the allegedly false and defamatory information Olivit attributes to Hartle can be the basis for the defamation claim. We therefore affirm the summary judgment entered in favor of Hartle and the CBJ.

### C. Olivit Failed To Preserve His Claim for False Light Invasion of Privacy.

The article stated that "[d]ocuments show the family settled [a 2002 lawsuit] for $25,000." In his initial verified complaint Olivit asserted that "[t]he Olivit family did not receive $25,000 for all lawsuits filed." Later, in his unsworn response to the Empire's motion for summary judgment, Olivit stated that Carroll "violate[d] the rights of privacy afforded to the Olivit family" when he "printed, disclosed, and divulged privileged information regarding financial settlements gained on behalf of Mr. Olivit's chil-

dren." In his brief to this court, Olivit states that "[r]epresentatives of the City promised explicit confidentiality in the settlement of previous lawsuits regarding monies received on behalf of *our children*." (Emphasis in original.)

In arguing that representatives of the city "broke their promise and they broke a contractual agreement," Olivit implies that Hartle was the source of the information. The article does not attribute the statement to Hartle, but rather to court documents. But assuming Olivit is correct that Hartle divulged the details of the lawsuit, Olivit has produced no evidence that the settlement was private or that the CBJ or Hartle owed any duty to keep it confidential. Additionally, Olivit's brief does not refer to the right to privacy, aside from a passing reference in a confusing list of issues that includes "defamation of character with actual malice, invasion of privacy (false light) with actual negligence, discrimination, civil rights violation of First Amendment and liable per se, IIED, and economic loss." Even considering the leniency that we grant to pro se litigants,[29] Olivit's passing reference to privacy in his brief does not preserve any claim of invasion of privacy or false light invasion of privacy.[30]

### D. Olivit Did Not Preserve His NIED or IIED Claims.

Olivit's list of appellate issues mentions intentional infliction of emotional distress (IIED). Olivit's initial complaint did not allege IIED, and he did not move to amend the complaint to add that claim. He first referred to emotional distress in his October 2005 "Plaintiff's Response to Defense Motion for Summary Dismissal of Tony Carroll and Juneau Empire"; he there stated that Carroll and the Empire were guilty of both IIED and negligent infliction of emotional distress (NIED). Olivit advanced a similar argument against Hartle and the CBJ in his "Plaintiff's Response to Defense Motion for Summary Dismissal of John Hartle and CBJ." In neither document did Olivit

---

**29.** *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062–63 (Alaska 2005) (stating that this court applies more lenient standard to pro se litigants).

**30.** *Wright v. Black*, 856 P.2d 477, 480 (Alaska 1993) (stating that pro se litigant must make good faith efforts to comply with judicial standards), *overruled on other grounds by B.E.B. v. R.L.B.*, 979 P.2d 514, 520 n. 47 (Alaska 1999).

attempt to show how Carroll's or Hartle's behavior satisfied the requirements of either IIED or NIED. The superior court did not address IIED or NIED beyond naming them as new theories of liability that Olivit had belatedly set out "without presenting claims for which he is entitled to relief." Because Olivit did not raise his IIED and NIED claims in a timely manner in the superior court, and because he does no more than mention "IIED" in his appellant's brief,[31] he has not preserved these claims.

### E. Other Issues

#### 1. The superior court was not biased against Olivit.

■ Olivit asserts that the superior court's "dismissal and judgment were prejudiced, discriminative," and "unconstitutional." Our review of the record reveals no indication whatsoever that Superior Court Judge Larry R. Weeks treated Olivit in anything less than a fair and impartial manner. The superior court made exemplary efforts in instructing and advising Olivit, a pro se litigant, on how to proceed. That the superior court ruled against Olivit on matters properly before the court, and ultimately granted summary judgment dismissing his claims, does not imply partiality or bias.[32]

#### 2. The superior court did not err in refusing to enter default judgment against the Empire.

■ Olivit argues that the superior court erred in refusing to enter default judgment against the Empire. Olivit requested an entry of default after the Empire answered its complaint four days late.

Per Alaska Civil Rule 55, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to appear and answer

... and that fact is shown by affidavit or otherwise, the clerk shall enter a default."[33] After the defendant has thus been defaulted, the plaintiff may apply for entry of a default judgment.[34] "A party may respond to any pleading at any time before a default is entered."[35] Olivit first requested a default *after* the Empire answered his complaint. The Empire filed its answer for itself and Carroll on July 8, 2005, five days before Olivit requested a default. The Empire therefore did not fail to appear, and the clerk could not have entered default against it after it filed its answer. There is no automatic default, and because the Empire responded to Olivit's claim before a default was even sought, no default was possible.

#### 3. The superior court did not err in granting attorney's fees to the CBJ and the Empire per Rule 82(b).

■ The superior court, per Alaska Civil Rule 82(b), awarded attorney's fees of $2,110.10 to the Empire and attorney's fees of $1,403.70 to the CBJ. Olivit contests these awards. He claims that (1) the Empire's fees were "inflated and fraudulent"; (2) the CBJ did not request fees in a timely manner; (3) the CBJ and the Empire did not prevail at trial; and (4) fees awards to the CBJ and the Empire violate the Alaska Constitution's due process clause.

■ Alaska Civil Rule 82 provides that "the prevailing party in a civil case shall be awarded attorney's fees."[36] If the case does not go to trial the prevailing party receives "20 percent of its actual attorney's fees which were necessarily incurred."[37] The defendants are the prevailing parties in this case because the superior court granted summary judgment in their favor.[38] Because the CBJ

---

31. Olivit makes no mention of NIED on appeal.

32. *See Wasserman v. Bartholomew*, 38 P.3d 1162, 1170–71 (Alaska 2002), *cert. denied*, 536 U.S. 929, 122 S.Ct. 2602, 153 L.Ed.2d 789 (2002) (noting that "[m]ere evidence that a judge has exercised his judicial discretion in a particular way is not sufficient to require disqualification").

33. Alaska R. Civ. P. 55(a)(1).

34. Alaska R. Civ. P. 55(b), (c).

35. Alaska R. Civ. P. 55(d).

36. Alaska R. Civ. P. 82(a).

37. Alaska R. Civ. P. 82(b)(2).

38. *See Meidinger v. Koniag, Inc.*, 31 P.3d 77, 88 (Alaska 2001) (holding that "[t]he prevailing party is the one who has successfully prosecuted or defended against the action, the one who is successful on the main issue of the action and in

and the Empire defendants were the prevailing parties and because there is no reason to think the total fees they respectively incurred ($7,018.50 and $10,555.50) are unreasonable, the superior court did not err in awarding them twenty percent of the fees they each incurred.

There is likewise no colorable basis for thinking that awarding the attorney's fees denied Olivit due process of law.

### 4. Olivit waived any other issues.

Olivit's brief also asserts "discrimination, civil rights violation of First Amendment ... and economic loss" against the CBJ and the Empire. Because Olivit does not support these contentions factually or legally, they are deemed waived.[39]

## IV. CONCLUSION

We therefore AFFIRM on all issues.

whose favor the decision or verdict is rendered and the judgment entered" (citation and internal quotation marks omitted)).

**39.** *See Gilbert v. Sperbeck,* 126 P.3d 1057, 1062 (Alaska 2005) (noting that "even when a pro se litigant is involved, an argument is considered waived when the party cites no authority and fails to provide a legal theory for his or her argument" (citation and internal quotation marks omitted)).